STATE OF CONNECTICUT *v.* JOSEPH F. BRIGANDI

SPEZIALE, C. J., PETERS, HEALEY, WRIGHT and SPONZO, Js.

Argued January 12—decision released March 23, 1982

*Maxwell Heiman,* with whom, on the brief, was *William J. Tracy, Jr.,* for the appellant (defendant).

*John F. Cronan,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Warren Maxwell,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to a jury, the defendant was found guilty of sexual assault in the first degree in violation of General Statutes § 53a-70.[1] The trial court denied his motion to set aside the verdict and this appeal followed. On appeal, he alleges that the court erred: (1) in admitting the victim's out-of-court statements

---

[1] The information charged, inter alia, that the defendant "did compel another person to engage in sexual intercourse by the use of force, in violation of Section 53a-70 of the General Statutes." The bill of particulars alleged that "On July 1, 1978, during the evening . . . the defendant struck a female victim, tied her hands, threatened to kill the victim's young son and assaulted her sexually. The defendant made the victim lie down whereupon he forced her to have, oral intercourse, anal intercourse, and vaginal intercourse with him."

identifying the defendant as her assailant; (2) in charging the jury with respect to evidence of constancy of accusation; (3) in finding the victim's ten-year-old son competent to testify; (4) in denying his motion for mistrial following the disqualification of a juror during the trial; and (5) in permitting the state to recall the victim as a witness and to reopen its case.

There was evidence[2] presented at the trial from which the jury could reasonably have found the following: On July 1, 1978, the victim, her husband and their three children lived in a six-room home in Berlin.[3] At about 10:45 p.m. on that date, the victim was beaten and sexually assaulted in the bathroom of her home by a male wearing a stocking mask over his face. She recognized her assailant as the defendant[4] "right away" as she could see right through the stocking mask which was "like ladies' stockings, hosiery." She screamed and he hit her in the mouth "with a closed fist"; she screamed again and he hit her again in the mouth in the same way. He said, "Shut up or I will kill you." After taking the phone off the hook, he threw her onto the floor on her stomach, sat on her legs and tied her hands behind her back with the belt of her husband's bathrobe. He then pushed her into the bathroom, closed the door, ripped her nightgown off her shoulders down to her waist and ran his hands all over her body. At that point she felt "[p]etrified, scared to death."

---

[2] Twenty-nine witnesses testified at the trial.

[3] On July 1, 1978, the victim's husband was at Fort Drum, New York, for his two week annual training with the National Guard and was scheduled to return home on July 7, 1978.

[4] The victim testified that the defendant had been a neighbor for five years; he lived with his wife and three children on the same street, about four houses down on the opposite side.

Her oldest child, T, ten years of age, called her from upstairs.[5] She told the defendant that she had better talk to T or he would keep calling her. Thereupon the defendant pushed her down the hall to answer T, and, while the defendant stood behind her, she told T to go back to bed and that she would be up in a few minutes. When they returned to the bathroom the defendant put a child's pajama top on her head, pushed her down on her knees and "forced [her] to perform oral sex on him several times." He then told her to lean over the vanity in the bathroom and tried unsuccessfully to penetrate her anus. He again forced her to her knees and he did penetrate her anus. Thereafter, he turned her over on her back and penetrated her vagina.

The defendant told her to stay there in the bathroom until he got away; she did so for maybe thirty seconds until she heard him leave. She went to the bottom of the stairs where she called T. He came down and, at her request, removed the pajama top from her head. Because her hands were tied, she asked T to call the police; it was about five minutes after eleven o'clock. He did so and she spoke to the police with T holding the phone. She tried to reach her parents, but they were not at home. She then had T dial her in-laws. She spoke to her mother-in-law and asked her to come right over. Berlin Police Officers Chant and Russell responded to the call and came to the victim's residence in a cruiser.[6] When Chant arrived, approximately two minutes after being dispatched, he observed that the victim was bleeding from the mouth, that she had a ripped

---

[5] The victim had three sons, ages ten, seven and four.

[6] Officer Chant testified that he was dispatched to the victim's residence as a result of a telephone call from that residence at 11:04 p.m.

nightgown, that her hands were bound behind her and that she was hysterical. He attended her "mouth wound" and untied her hands.

Chant was the policeman who first asked the victim if she knew who her assailant was and she told him she did not know. The victim's in-laws then arrived. Russell[7] drove the victim and her mother-in-law to the emergency room of New Britain General Hospital. Chant did not accompany them to the hospital although he did drive to the hospital later to pick her up and bring her home. Approximately three hours later, during her return from the hospital in Chant's cruiser, she identified the defendant as her assailant. Upon her return from the hospital, the victim's statement was taken by supernumerary police officer Arlene Laviana at the Berlin police headquarters.[8] The victim told police officers, relatives and a clinical social worker that it was the defendant who had assaulted her.

## I

Against the background of the circumstances already set out, we turn to the defendant's claims of error on the admission of certain evidence under the "constancy of accusation" exception to the hearsay rule and its instructions to the jury on that exception. The defendant claims that the admission of the victim's out-of-court statements identifying him as the assailant does not fall within the "constancy of accusation" hearsay exception because "an

---

[7] Officer Russell did not testify at the trial. There was evidence that, at that time, he was no longer working for the police department, that he was going to school and that Officer Chant did not know which school that was.

[8] Officer Arlene Laviana started taking the victim's statement at about 1:30 a.m. on July 2, 1978. It took approximately two hours to complete that statement which the victim then signed.

inconstancy of accusation" was shown by the evidence. He focuses on what occurred when the police first arrived at her home after being dispatched there at which time, prior to her going to the hospital, she told the police that she did not know who her assailant was. Her first statement, he argues, makes "a permanent break in the chain of constancy of accusation," and, because she was not constant in her accusations, her declarations were hearsay and thus erroneously admitted. In short, he maintains that the constancy of accusation exception is not applicable to this case. Moreover, because such declarations involved the identification of the defendant, he claims that their admission constituted prejudicial error. We do not agree with these claims.

In *State* v. *Kinney,* 44 Conn. 153 (1876), we affirmed and elucidated our rule on the "constancy of accusation" exception, originally laid down in *State* v. *De Wolf,* 8 Conn. 93 (1830). See also *State* v. *Brice,* 186 Conn. 449, 442 A.2d 906 (1982). In *Kinney,* we pointed out that the testimony of the woman upon whom the offense was allegedly committed could be confirmed[9] by testimony from witnesses to whom she had told the same story out of court. *State* v. *Kinney,* supra, 156; see *State* v. *Segerberg,* 131 Conn. 546, 549, 41 A.2d 101 (1945). We stated that for her to complain of the offense "would be natural if the crime had been committed, but very unnatural if it had not been." *State* v. *Kinney,* supra. Employing the same principle, we

---

[9] While we did not use the term "corroborate" with reference to that evidence permitted to confirm the victim's complaint directed to the accused, it is apparent that "corroborate," which was used in our later cases, was used synonymously with "confirm." See *State* v. *Segerberg,* 131 Conn. 546, 549, 41 A.2d 101 (1945).

reasoned that her statement of the details ought to be admitted into evidence and that "[i]f her story was true, the evidence would show constancy in the charge even to the details . . . ." *State* v. *Kinney,* supra, 156. In *State* v. *Purvis,* 157 Conn. 198, 207–208, 251 A.2d 178 (1968), cert. denied, 395 U.S. 928, 89 S. Ct. 1788, 23 L. Ed. 2d 246 (1969), which concerned our review of convictions of rape and kidnapping, we sustained the trial court's ruling admitting into evidence the testimony of a detective and a policewoman, who, after the victim had first testified to the details of the rape, were permitted to testify as to what she had related to them about the incident. *State* v. *Purvis,* supra, 207. In doing so, we said: "The ruling was in accord with the 'constancy of accusation' exception to the hearsay rule and with a long line of cases in which that exception has been recognized. *State* v. *Dziob,* 133 Conn 167, 169, 48 A.2d 377 [1946] [incest]; *State* v. *Segerberg,* 131 Conn. 546, 549, 41 A.2d 101 [1945] [indecent assault]; *State* v. *Orlando,* 115 Conn. 672, 677, 163 A. 256 [1932] [indecent assault]; *State* v. *Kinney,* 44 Conn. 153, 155 [1876] [rape]; *State* v. *DeWolf,* 8 Conn. 93, 100 [1830] [attempt to commit rape]." *State* v. *Purvis,* supra, 207–208; see *State* v. *Greene,* 161 Conn. 291, 294–95, 287 A.2d 386 (1971); *State* v. *Gelinas,* 160 Conn. 366, 367, 279 A.2d 552 (1971); see also 2 Wharton, Criminal Evidence (Torcia 13th Ed.) § 313.[10]

We cannot accept the defendant's claim that our "constancy of accusation" rule is not applicable in this case. The defendant would have the circumstance of the victim's telling the police, who came to

---

[10] In *Orlando* we said: "The admissibility of such statements by the victim of a rape is thoroughly settled in this State." *State* v. *Orlando,* 115 Conn. 672, 677, 163 A. 256 (1932).

her home within ten minutes after they were called, that she did not know her assailant be determinative of the issue of applicability of the "constancy of accusation" exception. Of course, this statement, per se, is not an "accusation" of anyone. Thus, her accusations against the defendant made shortly thereafter to several persons to whom she would naturally make a specific accusation were constant. In other words, once she made an accusation, it remained constant. This applies to such statements made to the victim's husband, mother-in-law, Chant and Laviana. There was evidence from her mother-in-law that, prior to leaving for the hospital and while in her bedroom, she told her mother-in-law that "she had been raped by a neighbor Joseph Brigandi."[11] The victim repeated the accusation to Chant during the drive back from the hospital, to Laviana early in the morning of July 2, 1978, at the Berlin police headquarters and to her husband upon his return on July 2, 1978.

A close examination of the evidence before the jury discloses the reason why the victim told the police that she did not know who her assailant was.[12] She testified: "The reason was because of my feelings for my son and for his [the defendant's] children." There was evidence before the jury that the victim's family and the Brigandi family were "socially friendly"; that the two couples visited with each other and on occasion went to dinner; that the two couples had been neighbors for about five years; that the defendant had been the cub scout

[11] The victim's mother-in-law testified that when her daughter-in-law told her this, they were alone in her bedroom and that she (the mother-in-law) did not know where the police were at that time; they were elsewhere in the house.

[12] On her initial direct examination, the victim had testified that she had a reason for not telling the police who her assailant was.

leader of the pack in which T, the victim's son, was a member; that the victim had been the den mother of that same pack and that on the afternoon of July 1, 1978, the defendant had taken his three children and T to the movies just hours before the assault occurred. The reason that the victim did not tell the police initially was, therefore, a fact for the jury to pass upon with all the other evidence.

Under the circumstances, the trial court did not err in ruling that the doctrine of "constancy of accusation" applied to the evidentiary rulings attacked. Whatever delay took place between the time of the attack and the time the victim first told witnesses of it does not affect the admissibility of the evidence, but merely presents a question of fact for the trier as to the weight to be given it. See *State* v. *Dziob*, 133 Conn. 167, 169, 48 A.2d 377 (1946); *State* v. *Sebastian*, 81 Conn. 1, 6, 69 A. 1054 (1908).

Additionally, the defendant claims that the court erred in charging the jury with respect to the evidence of constancy of accusation. He argues here that because of the victim's "initial inconsistent statements, constancy of accusation should not have been an element in the trial." He also observes that the "inconsistency in accusation" was recognized by the court in its instructions when it referred to her first statement to Chant at her home and that which she made to him during the return trip from the hospital.[13]

---

[13] The court charged as follows: "Constancy of accusation: Ordinarily, as you know, statements made out of Court by a party are not admissible, because they lack the support of the oath which a witness takes in Court; but to that general rule there are exceptions, and in this case we have encountered one of them.

"As I recall the testimony, the State offered evidence of statements made by [the victim] to her husband . . . on July 3rd, 1978, that

In ruling during the trial that the evidence concerning constancy of accusation, an exception to the hearsay rule, was admissible, the court acted in its capacity as the arbiter of the law in admitting or excluding proffered evidence. We have already held that the court was correct in its ruling. We observe that even if it be argued that the admissibility of evidence (here the claimed inconsistency) depends upon a preliminary question of fact to be determined by the court, "its decision is not to be reversed unless there is clear and manifest error."[14] *Engelke* v. *Wheatley,* 148 Conn. 398, 411, 171 A.2d 402 (1961). Having made its ruling on admissibility, the court, under adequate instructions on the limitations on the jury's use of the evidence concerning the issue of constancy of accusation, left it

---

Joseph Brigandi raped her. Also, to her mother-in-law . . . when the two were talking in the victim's bedroom, shortly after the incident, that she was raped by her neighbor, Joseph Brigandi. Well, to Officer Chant on her way back home from the hospital that the assailant was her neighbor, Mr. Brigandi. This was stated about three hours after she said to him she didn't know the assailant. To Officer Arlene Laviana that Joe Brigandi did it. These statements were admitted in evidence.

"Now, the reason for that is this: [The victim] testified here in Court as to the offense she claims was committed upon her; now if that was all you had before you, you would naturally ask yourselves why did she keep silent about it until she came to Court to testify? So, to corroborate her testimony, the State is permitted to prove that outside of Court she made complaints of the injury done her. This evidence is admitted solely to corroborate her testimony in Court, to be considered by you only in determining the weight and credibility you will accord her testimony.

"In determining the extent, if you will, such corroboration in her testimony out of Court, you will carefully consider all the circumstances under which they were made, and particularly you should consider whether she has been constant and consistent in what she has said."

[14] We equate this "clear and manifest error" language with the phrase "clearly erroneous." See Practice Book § 3060.

to the jury to decide as a question of fact "whether she [the victim] has been constant and consistent in what she has said." We find no error on this claim.

The defendant has also argued that the admission of this evidence under the constancy of accusation exception to the hearsay rule denied his right of confrontation guaranteed him by the sixth amendment to the United States constitution and article first of the Connecticut constitution. We cannot accept this claim.

We are aware that "the Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right and is made obligatory on the States by the Fourteenth Amendment." *Pointer* v. *Texas,* 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). For our purposes, it must be recognized that there are clearly different kinds of hearsay testimony, the character of which must be examined in any given case where a denial of the constitutional right of confrontation is claimed. In that regard, the United States Supreme Court has stated: "While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. See *Barber* v. *Page,* 390 U.S. 719 [88 S. Ct. 1318, 20 L. Ed. 2d 255] (1968);

*Pointer* v. *Texas,* 380 U.S. 400 [85 S. Ct. 1065, 13 L. Ed. 2d 923] (1965). The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied." *California* v. *Green,* 399 U.S. 149, 155–56, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970). Thus, the sixth amendment right of confrontation cannot be construed as merely codifying the hearsay rule and its recognized exceptions. *California* v. *Green,* supra; *Dutton* v. *Evans,* 400 U.S. 74, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970). In *Dutton* the court stated: "The decisions of this Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of the fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" *Dutton* v. *Evans,* supra, 89, citing *California* v. *Green,* supra, 161. It is the literal right to confront the witness at the time of trial "that forms the core of the values furthered by the confrontation clause. . . . " *California* v. *Green,* supra, 157; see *Mattox* v. *United States,* 156 U.S. 237, 242–43, 15 S. Ct. 337, 39 L. Ed. 2d 409 (1895); *State* v. *DeSantis,* 178 Conn. 534, 546, 423 A.2d 149 (1979); *State* v. *Burns,* 173 Conn. 317, 324, 377 A.2d 1082 (1977).

Our determination that there was no denial of the defendant's right of confrontation is reinforced when we compare the purposes of confrontation with the alleged dangers in admitting the out-of-court testimony objected to here. "Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by

the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *California* v. *Green,* supra, 158. "[The right of cross examination] is the principal means by which the believability of a witness and the truth of his testimony are tested (*Davis* v. *Alaska,* 415 U.S. 308, 316 [94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)]; cf. *Hoffa* v. *United States,* 385 U.S. 293 [87 S. Ct. 408, 17 L. Ed. 2d 374 (1966)], rehearing den. 386 U.S. 940 [87 S. Ct. 970, 17 L. Ed. 2d 880 (1967)])." *People* v. *Conyers,* 86 Misc. 2d 754, 758, 382 N.Y.S.2d 437 (1976), aff'd, 63 App. Div. 2d 634, 405 N.Y.S.2d 409 (1978). The defendant was able to confront the victim at trial with the opportunity to cross-examine her under oath before the jury. The same was true of each and every witness who testified on the matter of constancy of accusation. There was no violation of his right to confrontation.

## II

The defendant next claims that the court erred in finding the victim's ten-year-old son, T, competent to testify. In pressing this claim, the defendant maintains that it was a clear abuse of discretion for the trial court to have found this witness competent. We cannot accept this argument.

T was ten years old at the time of trial[15] and attended school in the fifth grade. In the absence of the jury, he was examined by the court, counsel for

[15] T testified that he became ten years old on August 15, 1979. The trial in this case took place during October and November, 1979.

the state and counsel for the defendant. In his brief the defendant maintains that T "admitted little understanding of essential obligation [of an oath]," that he "admitted not knowing what it meant not to tell a lie," that he "indicated that telling a lie would get him into trouble," that he "admitted that he did not know what it meant to tell the truth," that he "indicated that his limited understanding of the oath was based upon instruction by the State's Attorney" and that "he agreed that he was 'parroting' what he had been told."

"This court recently has had occasion to discuss the standards by which the competency of a child witness to testify is to be determined. 'The testimonial capacity of a child witness is a matter for the court to determine upon inquiry. *State* v. *Segerberg,* 131 Conn. 546, 547, 41 A.2d 101 (1945). In Connecticut, the examination to determine the competency of a witness is usually conducted by counsel under direction of the court, except insofar as the court may find it advisable to intervene. See *State* v. *Orlando,* 115 Conn. 672, 676, 163 A. 256 (1932). Because the competency of a witness is a matter peculiarly within the discretion of the trial court, its ruling will be disturbed only in a clear case of abuse or of some error in law. *State* v. *Siberon,* 166 Conn. 455, 457, 352 A.2d 285 (1974); *State* v. *Orlando,* supra, 675; *Kuczon* v. *Tomkievicz,* 100 Conn. 560, 572–73, 124 A. 226 (1924).

'In determining the competency of child witnesses, age is not the decisive factor. See *Kuczon* v. *Tomkievicz,* supra, 570; McCormick, Evidence (2d Ed.) § 62. Instead, the trial court must consider "the proposed witness' maturity to receive correct impressions by his senses, ability to recollect and

narrate intelligently, and ability to appreciate the moral duty to tell the truth." *State* v. *Siberon,* supra, 458. The witness should also have an intelligent comprehension of the facts sought to be developed. See *State* v. *Segerberg,* supra, 548; *Kuczon* v. *Tomkievicz,* supra, 570; McCormick, loc. cit.' *State* v. *Rodriguez,* 180 Conn. 382, 388, 429 A.2d 919 (1980). See also 2 Wharton, Criminal Evidence (13th Ed.) §§ 379–380." *State* v. *Stankowski,* 184 Conn. 121, 139–40, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981).

Upon reviewing the evidence, we do not agree with the defendant's claim that the trial judge abused his discretion by allowing T to testify. We are aware that a trial judge, in making such a determination as involved here, does so "from the whole situation, from facts and conduct observed during the examination, as well as from the questions propounded and which stand in the record." *Kuczon* v. *Tomkievicz,* 100 Conn. 560, 573–74, 124 A. 226 (1924); see *State* v. *Stankowski,* supra. We have examined the transcript and conclude that this witness could be found able to appreciate the moral duty to tell the truth and that he sufficiently understood the meaning of taking an oath to tell the truth.[16] Insofar as it is claimed that his limited

---

[16] The preliminary hearing disclosed in part the following:

"The Court: You go to church?

"The Witness: Yes.

"The Court: You go to Sunday School classes?

"The Witness: Yes.

"The Court: What do you learn?

"The Witness: About God and Jesus.

"The Court: What about and God and Jesus? You learn the Commandments?

understanding of the oath was based upon instruction by the state's attorney, the printed record does not sustain that argument; the same is true of his affirmative answer to defense counsel's question,

"The Witness: Yes.

"The Court: Thou shalt not tell a lie?

"The Witness: Yes.

"The Court: What does that mean to you?

"The Witness: I don't know.

"The Court: What happens if you tell a lie?

"The Witness: You get in trouble.

"The Court: With whom? Who is going to give you trouble?

"The Witness: Parents.

"The Court: Who else?

"The Witness: Everybody.

"The Court: Who is everybody?

"The Witness: Your family.

"The Court: God and Jesus give you trouble?

"The Witness: Yes.

"The Court: You think I would give you trouble if you told a lie?

"The Witness: Here?

"The Court: You know what it means to tell the truth?

"The Witness: No.

"The Court: You know what to tell the truth means?

"The Witness: No.

"The Court: You know what to tell a lie means?

"The Witness: We don't do that kind of stuff.

"The Court: What does tell a lie to you mean? You said you would be punished by everybody if you tell a lie?

"The Witness: Yes.

"The Court: What is a lie?

"The Witness: When you tell somebody and that is not the truth.

"The Court: A lie is not the truth and you would be punished for it, is that right?

"The Witness: Yes.

"The Court: Anyone have questions? Mr. Maxwell.

"Mr. Maxwell: Not at this time, your Honor.

"The Court: Mr. Heiman.

"Mr. Heiman: [T], why did you tell his Honor—I'm sorry. Why did you tell the man that was asking you questions, Judge Armentano, you just said to Judge Armentano you didn't know what it meant to tell the truth.

"Sort of parroting what he [the State's Attorney] said." We have had occasion to state: "Careful and conscientious instruction of young children who are prospective witnesses, honestly conducted by

"The Witness: Yes.

"Mr. Heiman: You don't really know what it means to tell the truth?

"The Witness: Right.

"Mr. Heiman: But, you know, that telling a lie is the opposite of telling the truth?

"The Witness: Yes.

"Mr. Heiman: Is that right?

"The Witness: Yes.

"Mr. Heiman: You don't know what it is to relate just the truth and not anything else?

"The Witness: Yes.

"Mr. Heiman: Thank you, [T].

"The Court: Did you ever hear the word oath?

"The Witness: Yes.

"The Court: What does it mean?

"The Witness: It is when you promise to tell the truth.

"The Court: And you promise to tell the truth?

"The Witness: Yes.

"The Court: The Court finds him qualified.

"Mr. Heiman: May I ask one question, so that I have a record?

"[T], did you talk with Mr. Maxwell before you came in here? Well, the gentleman seated here at the table. Did you talk with him?

"The Witness: Yes.

"Mr. Heiman: Is he the one who told you to tell—well, what an oath is, Mr. Maxwell tell you?

"The Witness: Yes.

"Mr. Heiman: Did you understand that before he told you that?

"The Witness: A little.

"Mr. Heiman: What you just told the judge is what Mr. Maxwell told you, isn't it, pretty much what he just told you?

"The Witness: Yes.

"Mr. Heiman: Yes. Sort of parroting what he said, is that right?

"The Witness: Yes.

"Mr. Heiman: All right.

"Mr. Maxwell: [T], let me ask you a couple of questions. Well, we went over this in my office, you remember that?

"The Witness: Yes.

parents or by upright counsel as to the nature, obligation and sanctions of an oath is entirely proper. Drilling such children mechanically to commit to memory certain matters in order to pass the

"Mr. Maxwell: You remember I asked you if you knew what an oath was?

"The Witness: Yes.

"Mr. Maxwell: I think you told me that you didn't really know, you remember that?

"The Witness: Yes.

"Mr. Maxwell: And then I asked you about TV and courtrooms, and what witnesses do.

"The Witness: Yes.

"Mr. Maxwell: You remember that?

"The Witness: Yes.

"Mr. Maxwell: What did you tell me they did, you remember that?

"The Witness: Come up to this chair.

"Mr. Maxwell: On TV what do they do?

"The Witness: Go up to a chair and then they answer questions that the lawyers ask them.

"Mr. Maxwell: You remember we were talking about the Bible before?

"The Witness: Yes.

"Mr. Maxwell: You were telling me?

"The Witness: Yes.

"Mr. Maxwell: Tell the judge about that.

"The Witness: What, the Bible?

"Mr. Maxwell: What you say the witnesses do? That is what I was asking you.

"The Witness: They put their left hand on the Bible and raise their right hand and promise to tell the truth.

"Mr. Maxwell: I didn't tell you that, you told me that, isn't that right?

"The Witness: Yes.

"Mr. Maxwell: All right. Thank you.

"The Court: Anything else?

"The Court finds him qualified.

"Mr. Maxwell: Exception.

"The Court: Exception noted.

Call the jury in.

(Whereupon the jury entered the courtroom.)

"The Court: You may be seated.

Stand up, [T]."

judge would deserve a different characterization. The trial judge had peculiar facilities for solving this problem." *Kuczon* v. *Tomkievicz,* supra, 574. That principle applies here.[17] The ruling on competency was correct.[18]

## III

The defendant also claims that the trial court erred in denying his motion for a mistrial follow-

---

[17] In *State* v. *Orlando,* 115 Conn. 672, 676, 163 A. 256 (1932), we recognized that a child witness could not be disqualified, as a matter of law, because of her failure to define an oath or because she stated that she did not know what it was to be a witness. "It may well be that questions asking for definitions of words or involving broad generalizations may be beyond the mental capacity of the child under examination and of no benefit in determining his competency."

[18] Nowhere in his brief or in argument before us on this issue did defense counsel make any claim that, at the preliminary hearing to determine T's competency, he did not have an intelligent comprehension of the facts sought to be developed or was not able to recollect and narrate those facts intelligently. See *State* v. *Segerberg,* 131 Conn. 546, 548, 41 A.2d 101 (1945).

We have observed that where such a claim is actually made, there is a procedure for the defendant to follow. See *State* v. *Rodriguez,* 180 Conn. 382, 429 A.2d 919 (1980). In *Rodriguez,* where such a claim was actually made and briefed, we said: "In order to demonstrate to this court that the error committed by the trial court was harmful, it was incumbent upon the defendant to include in his brief those portions of the transcript of Serrano's testimony that evidence Serrano's actual inability to comprehend intelligently the facts sought to be developed or to recollect and narrate intelligently those facts. This was not done. Such an examination of the testimony given is necessary, for even though a proper foundation had not been laid establishing competency at the preliminary hearing, had the testimony later given satisfied the applicable tests, any error in the preliminary ruling would not be considered harmful." *State* v. *Rodriguez,* supra, 391.

Despite the defendant's failure to follow this procedure, we have, nevertheless, in the interests of justice examined all the testimony given by T, both at the preliminary hearing in the absence of the jury and before the jury. The evidence he gave does demonstrate T's ability to recollect and narrate intelligently those facts. See *State* v. *Rodriguez,* supra.

ing the disqualification of a juror during the trial.[19] The defendant's claim of error in the denial of a mistrial is two-pronged. He argues that (1) the juror became a witness in the case without the precaution of an oath and without an opportunity for cross-examination by the defendant; and (2) the

[19] The discussion after the jury left the courtroom was as follows:
"The Court: The jury may be excused.
Well, the young lady will remain.
(Whereupon the jury left the courtroom.)
"The Court: Come over here, please. Now, your number?
"The Juror: 1027.
"The Court: 1027, Smith.
Now, what is the situation?
"The Juror: I have chaired a committee in New Britain that this young lady was a member.
"Mr. Heiman: You know her from working with her on a committee?
"The Juror: Nothing about her background or anything like that. I do know her.
"Mr. Heiman: The question, do you know her from working with her on a committee?
"The Juror: I know her name and—
"Mr. Heiman: You worked with her, she was on a committee?
"The Juror: On a committee that I chaired.
"The Court: How long did this committee continue?
"The Juror: At least one year, your Honor.
"The Court: One year. In that period of time how many times did you actually see and talk with her?
"The Juror: The committee met once a month. I was present— I really don't know if she was present at every meeting or not. Well, through September through June.
"The Court: Did you socialize with her?
"The Juror: Never.
"The Court: You talked with her many times?
"The Juror: Not really.
"The Court: Well, would this make any difference in rendering your verdict? Would you be fair?
"The Juror: I believe I could.
"The Court: And impartial?
"Mr. Heiman: Excuse me. I will make a Motion.
"The Court: You are excused. Thank you.
"Now, don't discuss the matter with any members of the jury. Don't discuss this matter with any member of the jury.
"You may report downstairs to Mr. Short."

"continued presence" of the juror on the panel created circumstances capable of influencing the deliberative function of the jury. He maintains that this action of the trial court denied his rights to a trial by an impartial jury and due process of law in violation of the sixth and fourteenth amendments to the United States constitution and article first, section 8 of the Connecticut constitution. We must reject these claims.

The victim was the first witness called by the state. After she had testified for a short time on direct examination, a juror, one Mrs. Smith, addressed the court saying: "I probably should be excused. I have chaired a committee with this lady." Defense counsel thereupon stated: "If your Honor please, excuse the jury." The court then said: "The jury may be excused. Well, the young lady will remain." Whereupon, the jury left the courtroom while Mrs. Smith remained. The court and defense counsel then questioned Mrs. Smith and the court excused her. In excusing her, the court instructed her not to discuss the matter with any member of the jury and directed her to report downstairs to the clerk in charge of the jury. Defense counsel then moved for a mistrial claiming prejudice pointing out that Mrs. Smith's statement before the jury that she served on "committees"[20] with the victim put the defendant in a "God-awful light" and tended to place the victim in a good light before the jury. This factor, the defendant claimed, prejudiced his case because "[o]ne of the claims in this case is that this lady entices gentlemen into this relationship or liaison." The court denied the motion for mistrial, ordered the selection of an alternate to take Mrs. Smith's place on the jury and stated that its reason

---

[20] Mrs. Smith had said a "committee" not "committees."

for denying the mistrial was that it found no prejudice. Before the jury returned, defense counsel requested that, with respect to Mrs. Smith's no longer being a juror, the court instruct the jury that it was "not to draw any inferences of what was said or transpired." The trial court did so when the jury returned.[21]

Impartiality as a core requirement of the right to trial by jury is served not only by the sixth amendment, which applies to the states as well as to the federal government; see, e.g., *Witherspoon* v. *Illinois*, 391 U.S. 510, 529, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968) (Douglas, J., concurring); *Parker* v. *Gladden*, 385 U.S. 363, 364, 87 S. Ct. 468, 17 L. Ed. 2d 420 (1966); but also by the due process and equal protection clauses of the fourteenth amendment. See, e.g., *Peters* v. *Kiff*, 407 U.S. 493, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972). We have held that the due process clauses of both the United States and Connecticut constitutions have the same meaning and impose similar limitations. "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin* v. *Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). "Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced

---

[21] At that time the court instructed the jury as follows:

"The Court: Ladies and gentlemen of the jury, Mrs. Smith has been excused from this case and Mrs. Crowley, the alternate, takes the place of the one so excused.

"I want to caution you not to draw any inferences of any kind from what you have heard or observed in this courtroom a few moments ago. Well, not to draw any inferences of any kind from what you saw or heard while you were present. In your deliberations completely remove that from your minds. Those are the instructions of the Court."

jury in an atmosphere of judicial calm. U.S. Const., amend. XIV; Conn. Const., art. I, § 8 . . . . In a criminal trial, the judge is more than a mere moderator of the proceedings. It is his responsibility to have the trial conducted in a manner which approaches an 'atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding.' " *State* v. *Echols,* 170 Conn. 11, 13, 364 A.2d 225 (1975). Because the judge is not an interlocutor presiding over a debate, but is a minister of justice, he is, to that end, empowered to exercise a reasonable discretion in the conduct of a trial. See *Connecticut Light & Power Co.* v. *Kluczinsky,* 171 Conn. 516, 521, 370 A.2d 1306 (1976); *McWilliams* v. *American Fidelity Co.,* 140 Conn. 572, 580–81, 102 A.2d 345 (1954). "The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome." *State* v. *Bausman,* 162 Conn. 308, 312, 294 A.2d 312 (1972).

"The general principle is that a mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial[;] *State* v. *Peary,* 176 Conn. 170, 172–73, 405 A.2d 626 (1978); *State* v. *Ruiz,* 171 Conn. 264, 368 A.2d 222 (1976); *State* v. *Brown,* 169 Conn. 692, 703, 364 A.2d 186 (1975); *State* v. *Rose,* 168 Conn. 623, 635, 362 A.2d 813 (1975)"; *State* v. *Turcio,* 178 Conn. 116, 143, 422 A.2d 749 (1979); "and the whole proceedings are vitiated." *State* v. *Peary,* 176 Conn. 170, 173, 405 A.2d 626 (1978); see *State* v. *Hafner,* 168 Conn. 230, 245–46, 362 A.2d 925 (1975). The court has wide discretion in passing on motions for mistrial. *State* v. *Turcio,* supra; *State* v. *Ruiz,* supra, 274; *State* v. *Bausman,* supra.

Applying these principles to the claim of the defendant, we conclude that the trial court acted properly and within its discretion in denying this motion for mistrial. The juror, Mrs. Smith, was not a "witness" as claimed; she was acting as a juror. The trial court, after her statement which resulted in the excusing of her fellow jurors from the courtroom, examined her in her capacity as a juror and in its function of endeavoring to assure a fair trial. During this questioning by the court, defense counsel actually asked several questions of the juror and the state directed no questions to the juror. After the jurors returned, the court instructed them as requested by defense counsel and no exception was taken to that instruction.

We are not persuaded, after careful consideration, that the defendant's claim, that Mrs. Smith's "continued presence" on the panel created circumstances capable of influencing the deliberative function of the jury, has merit. Our examination of the record before us leads us to find no substance to this claim keeping in mind, inter alia, the circumstance that this occurred only minutes after the start of the direct examination of the state's first witness.

## IV

The defendant's final claim of error is twofold. It maintains that the court erred in (1) permitting the state "repeatedly" to recall the victim; and (2) permitting the state to reopen its case in chief. We do not agree.

During the trial the victim testified on three occasions. She was the state's first witness testifying on October 30, 1979. On the next day, she was recalled by the state and testified. On the afternoon

of November 1, 1979, the state rested and court adjourned for the day. The next morning, before the defense went forward with its evidence, the state moved to reopen its case in order to make an offer of proof and to put a neighbor on whom the state had forgotten to put on.[22] The state then said it wanted to put the victim back on the stand to "ask her why she did not make a positive indentification of the defendant when the police officers first walked into the house." The defense objected,[23] particularly to her being permitted to return to the witness stand, pointing out that this was an attempt to refute cross-examination of a witness who testified after the victim had.

We have noted that it is within the sound discretion of the court to permit the state to reopen its case after it has rested. See State v. Levy, 103 Conn. 138, 145, 130 A. 96 (1925); State v. Ricker, 90 Conn. 147, 152, 96 A. 941 (1916); see generally 23 C.J.S., Criminal Law § 1055. " 'The reopening of a criminal case either to present omitted evidence or to add further testimony after either of the parties has rested is within the sound discretion of the Trial Court. Harrison v. United States, 5 Cir. 1968, 387 F.2d 614; Massey v. United States, 10 Cir. 1966, 358 F.2d 782; Lucas v. United States, 8 Cir. 1965, 343 F.2d 1.' United States v. Wilcox, 450 F.2d 1131,

[22] At this point defense counsel indicated that he did not have any objection.

[23] This matter had apparently been discussed in chambers, particularly to determine what effect the victim's identifying the defendant would have on T. In open court the state indicated on its offer of proof, inter alia, that "her testimony will be that at the time the police officers entered the house T was standing right there with them, and it was because of her feelings for T, knowing his relationship with Mr. Brigandi, and quite frankly of the feelings she had for Mr. Brigandi's children and wife that she was afraid to mention his name. That will be the proof."

1143 (5th Cir. 1971)." *United States* v. *Sisack*, 527 F.2d 917, 919 (9th Cir. 1976). "[T]he trial court must be vested with discretion to permit reopening when mere inadvertence or some other compelling circumstance . . . justifies a reopening and no substantial prejudice will occur." *United States* v. *Hinderman*, 625 F.2d 994, 996 (10th Cir. 1980); see *United States ex rel. Carraway* v. *McMann*, 297 F. Sup. 390, 394–95 (S.D.N.Y. 1969).

"The matter of recalling a witness after he had testified rests within the sound judicial discretion of the trial court and the exercise of such discretion will not be interfered with unless there is a clear showing of abuse. This appears to be the universal rule. [Citations omitted.]" *State* v. *Droste*, 232 N.W.2d 483, 488 (Iowa 1975); see *Faust* v. *United States*, 163 U.S. 452, 455, 16 S. Ct. 1112, 41 L. Ed. 224 (1896); *Farabaugh* v. *Baltimore & O. R. Co.*, 96 F. Sup. 205, 206 (W.D. Pa. 1951); *State* v. *Adams*, 46 N.C. App. 57, 61–62, 264 S.E.2d 126 (1980); 6 Wigmore, Evidence (Chadborne Ed. 1976) §§ 1867, 1898; 81 Am. Jur. 2d, Witnesses § 424. In *Farabaugh* v. *Baltimore & O. R. Co.*, supra, 207, the court said: "Where a witness is recalled to testify after his direct and cross-examination, he should be permitted to state the reason for altering or modifying his testimony. This should be allowed in order that the jury could properly evaluate the credibility to be given the whole of the testimony presented by said witness."

In this case although the reopening was granted, it took place before the defense went forward with its evidence. The matter presented at that time through the victim had already been touched on earlier. The evidence of the other witness whom

the state admitted it had forgotten to put on had also been touched on earlier. The defense had full opportunity to examine and cross-examine and no surprise was claimed. No prejudice to the defendant has been demonstrated, nor was there any denial of his right to a fair trial. There was no abuse of discretion in denying the defendant's motion for mistrial.

There is no error.

In this opinion the other judges concurred.