STATE OF CONNECTICUT *v.* LATROY HOLMES
(AC 26344)

Flynn, Bishop and DiPentima, Js.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued January 3—officially released March 21, 2006

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Anne F. Mahoney*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Latroy Holmes, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a, criminal possession of a firearm in violation of General Statutes § 53a-217, carrying a pistol without a permit in violation of General Statutes § 29-35 and risk

of injury to a child in violation of General Statutes § 53-21. On appeal, the defendant claims that the trial court (1) abused its discretion when it determined that a certain child witness was competent to testify, (2) improperly held that there was sufficient evidence to support his conviction for carrying a pistol without a permit in violation of § 29-35 and (3) abused its discretion when it excused a juror over the defendant's objection. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and the victim, C,[1] cohabited[2] in an apartment with their daughter, H, and C's daughter, Q.

On June 3, 2001, the defendant told an acquaintance, Lee Hardy, that he believed that C was "messing around on him." That evening, the defendant went to the apartment. When the defendant arrived, C was in the living room with H, and her elder daughter Q was in a bathroom taking a shower. After entering the apartment, the defendant asked C who she was "messing with." According to H, who was present at the time, when C did not respond, the defendant shot C and told H to go upstairs. H testified that when she went upstairs, she heard gunshots and heard her mother screaming. H then jumped from the window of an upstairs bedroom into the arms of neighbors.

Q testified that she heard "loud bangs" while in the shower and heard her mother screaming. She stated

---

[1] In accordance with our policy of protecting the privacy interests of children, we decline to identify the children of the victim or others through whom the children's identities may be ascertained. Hereinafter, the initial C shall refer to the victim. The initials H and Q shall refer to the victim's two daughters. H is also the daughter of the defendant. The father of Q shall be referred to by the initial T.

[2] The evidence at trial established that although the apartment was not the only place the defendant resided, he spent many nights there and kept clothing there. As such, the court found that it was his dwelling.

that when she ran downstairs, she saw the defendant standing in front of C, pointing a revolver. C was unarmed and lying in blood on the kitchen floor, screaming and rocking back and forth. Q testified that she saw the defendant fire two gunshots into the ceiling and that as she ran from the apartment, she heard the sound of two more gunshots.

A neighbor, Romana Obaez, testified that she also heard a gunshot and saw H crying as she was opening an upstairs window in the apartment, saying: "My father [is] killing my . . . mother." Another neighbor, Louis Tucker, who ran toward the apartment because he heard sounds that he believed to be gunshots, saw the defendant emerge from the residence, speaking on a cellular telephone, uninjured and without any signs of blood on his person. Tucker testified that when he asked the defendant, "Why did you do this, man?" the defendant stated, "I had to do what I had to do."

An acquaintance of the defendant, Andre Newton, testified that the defendant called him from a cellular telephone that evening and asked Newton to pick him up. Newton stated that when he arrived to pick up the defendant, the defendant initially refused the ride, but that later the defendant again called him. When he returned to pick up the defendant, he noticed that the defendant was limping and appeared to have been shot. Newton recalled that the defendant told him that he had killed C. Newton could not remember whether the defendant told him that C had shot him first. Newton stated that he noticed blood on the defendant's boots, but found no bloodstains in his car after giving the defendant a ride.

The police search of the murder scene in the apartment revealed a .357 magnum Smith & Wesson revolver near the front door. The police also found copper jacketed projectiles in the kitchen and near the front door.

The state forensic laboratory determined that the projectiles had been fired from the Smith & Wesson revolver recovered from the residence.

On June 4, 2001, an autopsy of C's body revealed that she died from a gunshot wound to the chest. Examination of the gunshot wound and its trajectory suggested that the shooter was three to seven feet away from her. The autopsy also revealed that the victim was shot three times below her right knee.

When the defendant was apprehended in August, 2001, he was examined by Anthony J. Coppola, a physician, who testified at trial that the defendant's left thigh had been grazed by a bullet and that he had scars on his groin and behind his scrotum, consistent with entry and exit bullet wounds. Coppola testified that the wounds could have been inflicted in June, 2001.

I

The defendant first claims that the court abused its discretion when it determined that H was competent to testify. Specifically, the defendant claims that the voir dire of H failed to establish that she could appreciate her duty to tell the truth or the difference between the truth and a lie. We are not persuaded.

The following additional facts aid our discussion of the defendant's claim. At trial, the defendant raised the affirmative defense of self-defense. As a consequence, the determination of whether the victim or the defendant was the initial aggressor was probative. As part of its case-in-chief, the state proffered the testimony of H to establish that the defendant murdered C and that the defendant was the initial aggressor. The only witness to the murder, H, was six years old at the time of the incident and eight years old when she testified.

At trial, the defense requested that the court voir dire H to determine if she was "minimally capable of

understanding the duty to tell the truth and communicating the events to which she'll testify."[3] During voir dire, H answered in the affirmative when asked if she knew that she must tell the truth while testifying and that the law required her to tell the truth. When asked what it meant to tell the truth she stated, "It means that you can't tell no lies." When asked if she attended church, she replied, "Some of the times." When she was asked, "[W]hat does it mean if you don't tell the truth?" she responded, "Things don't go right if you don't tell

---

[3] Outside the presence of the jury, the follow colloquy ensued during the voir dire of H:

"[The Prosecutor]: . . . [C]an you tell us how old you are?

"[The Witness]: Eight. . . .

"[The Prosecutor]: Okay. Am I going to ask you some questions about the day your mom died?

"[The Witness]: Yes.

"[The Prosecutor]: Okay. . . . Your Honor, I would offer that.

"The Court: [H], do you know that you have to tell the truth here; that it's important?

"[The Witness]: Yes.

"The Court: And that the law requires it?

"[The Witness]: Yes.

"The Court: Okay. Good. Any questions?

"[Defense Counsel]: Yes, I do, Your Honor. . . . Hi, [H]. I'm attorney Bernstein. We haven't met before. How are you?

"[The Witness]: Good.

"[Defense Counsel]: Good. [H], what does it mean to tell the truth?

"[The Prosecutor]: I'm going to object, Your Honor. I don't think adults can answer that.

"[The Witness]: It means that you can't tell no lies.

"[Defense Counsel]: Okay. And, [H], do you go to church?

"[The Witness]: Huh?

"[Defense Counsel]: Do you go to church?

"[The Witness]: Some of the times.

"[Defense Counsel]: Some of the times. Okay. What happens—what does it mean if you don't tell the truth?

"[The Witness]: Things don't go right if you don't tell the truth.

"[Defense Counsel]: Okay. And is it important to tell the truth?

"[The Witness]: Yes.

"[Defense Counsel]: Why?

"[The Witness]: I don't know.

"[Defense Counsel]: Okay. . . . I have nothing further, Your Honor.

"The Court: Jury out, please. The witness is quite competent."

the truth." When asked if she knew it was important to tell the truth, she replied yes, but stated that she did not know why it was important. Thereafter, the judge held that H was competent to testify.

As our Supreme Court has stated, the trial court is in a unique position to determine the competency of a witness. *State* v. *Boulay*, 189 Conn. 106, 108, 454 A.2d 724 (1983). On appeal, "[w]e review the court's determination of competency under an abuse of discretion standard. . . . In determining whether the trial court [has] abused its discretion, this court must make every reasonable presumption in favor of [the correctness of] its action. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Internal quotation marks omitted.) *State* v. *Garcia*, 81 Conn. App. 294, 299–300, 838 A.2d 1064 (2004).

"In determining the competency of a proposed witness the trial court should consider the capacity of the witness to receive correct sense impressions, to comprehend the facts to be developed, to recollect and narrate facts intelligently, and to appreciate the moral duty to tell the truth. . . . Regarding the duty of truthfulness, [our Supreme Court] has explained, [t]he competent witness must possess some sense of moral responsibility and comprehend the purpose and character of an oath. . . . An oath . . . signifies the undertaking of an obligation to speak the truth at a time when . . . . testimony may deeply affect the rights and the character of individuals." (Citations omitted; internal quotation marks omitted.) *State* v. *Boulay*, supra, 189 Conn. 108–109.

As to a child witness, our Supreme Court in *State* v. *Brigandi*, 186 Conn. 521, 534–35, 442 A.2d 927 (1982), opined that age, alone, is not the decisive factor. Rather,

the court stated that "the trial court must consider the proposed witness' maturity to receive correct impressions by his senses, ability to recollect and narrate intelligently, and ability to appreciate the moral duty to tell the truth. . . . The witness should also have an intelligent comprehension of the facts sought to be developed." (Citation omitted; internal quotation marks omitted.) Id.

As to the measure of capacity, our Supreme Court, in *State* v. *Weinberg*, 215 Conn. 231, 243, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990), adopted the approach used by the federal courts, holding that "where the competency of a witness is challenged, the threshold question to be answered by the court is whether the testimony of that witness is minimally credible." The court concluded that "[i]f the testimony of a witness passes the test of minimum credibility, and is otherwise relevant, the testimony is admissible and the weight to be accorded it, in light of the witness' incapacity, is a question for the trier of fact." Id., 243–44.

In sum, a trial judge must ensure that all witnesses, regardless of age (1) have the capacity to receive correct sense impressions, to comprehend the facts to be developed, to recollect and to narrate facts intelligently and (2) can appreciate the moral duty to tell the truth. *State* v. *Brigandi*, supra, 186 Conn. 534–35.

Here, the defendant does not argue that H lacked the capacity to receive correct sensory impressions, comprehend the facts or narrate facts intelligently. Rather, he argues that the voir dire of H did not establish that H could appreciate her moral duty to tell the truth because it did not establish that she appreciated the difference between telling the truth and telling a lie.

Contrary to the defendant's assertion, the record reflects that H comprehended not only the distinction

between telling the truth and telling a lie, but she also understood the consequences of telling a lie, that she was required to tell the truth while testifying and that if one did not tell the truth, "[t]hings don't go right . . . ." Although H's statement may not have reflected a developed sense of the penalty for lying under oath, we believe that her response adequately conveyed to the court an understanding that lying under oath has negative consequences. This answer, coupled with her other responses during voir dire, provided the court with an adequate basis on which to exercise its discretion to permit H to testify.

Our Supreme Court has upheld a court's finding of competency of a child witness to testify on arguably less compelling facts than the ones at hand. In *State* v. *Brigandi*, supra, 186 Conn. 521, the court held that a ten year old boy was competent to testify even though he "admitted little understanding of [the] essential obligation [of an oath], that he admitted not knowing what it meant not to tell a lie . . . admitted that he did not know what it meant to tell the truth, that he indicated that his limited understanding of the oath was based upon instruction by the [s]tate's [a]ttorney and that he agreed that he was parroting what he had been told." (Internal quotation marks omitted.) Id., 534. The court noted, however, "that he indicated that telling a lie would get him into trouble . . . ." (Internal quotation marks omitted.) Id. The court acknowledged that a trial judge makes the decision of competency on the basis of "the whole situation, from facts and conduct observed during the examination, as well as from the questions propounded and which stand in the record." (Internal quotation marks omitted.) Id., 535.

The defendant maintains that *Brigandi* is inapposite because, unlike the child witness in *Brigandi*, the court's voir dire of H did not establish that H acknowledged the "connection between a lie and . . . punish-

ment." Our Supreme Court has stated, however, that "[k]nowledge of the consequences of perjury is not necessarily a prerequisite to competency . . . especially where the witness has demonstrated an understanding of a duty to tell the truth." (Citation omitted.) *State* v. *Boulay,* supra, 189 Conn. 110. We believe that H's statements during the voir dire were sufficient to establish that she understood there would be consequences for not telling the truth and that she had a duty to tell the truth while testifying. Although H stated that she did not know why it was important to tell the truth, she did acknowledge that she had to tell the truth while testifying and that if she failed to tell the truth, "[t]hings [would not] go right . . . ."[4] Accordingly, we hold that the court's finding of competency was correct.

## II

Next, the defendant claims that there was insufficient evidence to support his conviction for carrying a pistol without a permit, in violation of § 29-35. We disagree.

The following additional facts are relevant to the defendant's claim. On June 1, 2001, two days before the murder of C, the defendant took a loaded .357 magnum Smith & Wesson revolver from his friend, Newton. A .357 magnum Smith & Wesson revolver also was recov-

[4] The defendant also refers to inconsistencies in H's testimony to support his contention that the court improperly held that she was competent to testify. This claim lacks merit because "[t]he defendant's focus on the inconsistencies in the witness' testimony is in essence an attack on the witness' credibility. . . . Inconsistencies in testimony and witness credibility are matters that are within the exclusive purview of the [trier of fact] to resolve at trial. . . . [I]nconsistencies . . . neither demonstrate that the witness does not have an intelligent comprehension of the facts, nor prevent the witness from meeting the minimum credibility requirement. . . . Inconsistencies do not render a witness' testimony incredible as a matter of law. . . . Furthermore, a failure to demonstrate an intelligible recollection of the facts at issue can later be rectified through the witness' testimony." (Citations omitted; internal quotation marks omitted.) *State* v. *Gainer,* 51 Conn. App. 563, 570, 724 A.2d 521 (1999).

ered by the police on June 3, 2001, during the police search of the murder scene, and forensic testing revealed that five of the six discharged[5] cartridges at the murder scene had been fired from that revolver. Although Newton testified that the revolver recovered from the scene looked like the revolver the defendant took from him on June 1, 2001, he could not state with certainty that the revolver found at the scene was the same revolver the defendant had taken from him. No evidence introduced at trial, however, indicated that C owned a revolver or kept a revolver at the apartment. Furthermore, there was evidence at trial that no persons other than C and her two daughters lived in the apartment while the defendant lived there.[6]

Pursuant to § 29-35, it is a crime for a person to carry a pistol or revolver without a valid permit, except if the person is within his dwelling or place of business.[7] Because the court found that the defendant resided in the apartment, the court charged the jury that the state was required to prove "beyond a reasonable doubt that the defendant carried a revolver upon his person while outside his dwelling house and that he did not have a permit to do so." The court stated, however, that "[while] it is not a crime to have the weapon in the dwelling house under this statute, [one] may consider that . . . as evidence as to whether [the defendant] brought it to [the apartment] . . . ."

The defendant concedes that there was sufficient evidence at trial to establish that he possessed a revolver at some time on June 3, 2001, in the apartment,

---

[5] The sixth cartridge was marked "special."

[6] The evidence at trial established that the father of Q, T, did not reside at the apartment during the time that the defendant lived at the residence.

[7] Pursuant to General Statutes § 29-35 (a), "[n]o person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

without a permit. The defendant claims, however, that there was insufficient evidence to convict him of a violation of § 29-35 (a) because there was no evidence to explain how he came into possession of a .357 magnum Smith & Wesson revolver in the apartment.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citation omitted; internal quotation marks omitted.) *State* v. *Webb*, 75 Conn. App. 447, 450–51, 817 A.2d 122, cert. denied, 263 Conn. 919, 822 A.2d 244 (2003).

Construing the evidence in the light most favorable to sustaining the verdict, we believe that the jury's determination that the defendant carried a pistol, without a permit, near or to the apartment was supported by the evidence at trial. The jury reasonably could have found that C did not have a revolver in her residence and reasonably could have inferred that the .357 magnum Smith & Wesson revolver found at the murder scene was the same revolver the defendant had taken from

Newton some time before the murder. Additionally, the jury reasonably could have concluded that the cumulative force of the evidence established beyond a reasonable doubt that after taking the revolver from Newton, the defendant carried it to the apartment, in violation of § 29-35 (a). Accordingly, there was sufficient evidence to support the defendant's conviction for carrying a pistol without a permit.

## III

Finally, the defendant claims that the court abused its discretion in dismissing a juror over the defendant's objection. We disagree.

At trial, the state introduced the testimony of Hardy, an acquaintance of the defendant. Hardy testified that while he was driving around with the defendant on the day of the murder, the defendant disclosed to him that he believed C was "messing around on him." After Hardy testified, one of the jurors, J,[8] informed the court that he recognized Hardy because Hardy was his neighbor in the 1970s and 1980s.[9] J stated that although he

---

[8] To protect the identity of the juror, we refer to him by the initial J. See *State v. Newsome*, 238 Conn. 588, 624 n.12, 682 A.2d 972 (1996).

[9] The following colloquy occurred during the voir dire of the juror:

"The Court: You indicated to the—one of the marshals that you recognized the witness who just testified, Mr. Hardy?

"[The Juror]: Yes.

"The Court: And how do you know him?

"[The Juror]: He used to stay across from me on Kensington Street in the [19]70s and [19]80s?

"The Court: Yes, could you pull up a little bit to the microphone.

"[The Juror]: Yes, I used to stay across from him on Kensington Street during the [19]70s and [19]80s.

"The Court: Okay. So, he was your across the street neighbor?

"[The Juror]: Yes.

"The Court: Did you —other than that, did you have contact with him?

"[The Juror]: Sometimes.

"The Court: Well, could you tell us about those contacts?

"[The Juror]: Nothing. We would just speak and talk, you know, never really got real close or personal. But at the time, his mother used to come to my mother's house.

"The Court: Okay. So, you didn't go to school together or work together?

## spoke with Hardy on occasion and played basketball

"[The Juror]: No.

"The Court: Did you belong to any clubs or organizations together?

"[The Juror]: No.

"The Court: Did you socialize, go to events, ballgames, concerts, anything like that?

"[The Juror]: Not really, probably played, like, ball in the park.

"The Court: Well, he's just testified here today.

"[The Juror]: Yes.

"The Court: Does your previous knowledge of him in any way affect your judgment as to his credibility?

"[The Juror]: I can't say for sure.

"The Court: Counsel, questions?

"[Defense Counsel]: May we just have a moment?

"(Defense Counsel and another public defender briefly conferred.)

"[Defense Counsel]: May I ask the juror or do you—

"The Court: Yes.

"[Defense Counsel]:—want us to just . . . Do you think that you can evaluate Mr. Hardy's testimony the way that you would any other witness?

"[The Juror]: Probably so.

"[Defense Counsel]: You think so. You think that you could still be fair to both sides?

"[The Juror]: I think so.

"[Defense Counsel]: Okay. Do you think that knowing Mr. Hardy would influence you toward one side or another?

"[The Juror]: It's kind of hard to say. I mean.

"[Defense Counsel]: Well, how do—how do you think it would affect you?

"[The Juror]: I don't know. It may not.

"[Defense Counsel]: Well, you know yourself better than we do.

"[The Juror]: I probably wouldn't think so.

"[Defense Counsel]: Okay.

"The Court: Have you seen him since the 1980s?

"[The Juror]: I haven't seen him in a long time, you know.

"The Court: Well, the 1980s are a relatively long time.

"[The Juror]: Yeah.

"The Court: You played ball sometimes?

"[The Juror]: Yes.

"The Court: I mean, Mr. Hardy's testimony, while it's direct testimony, it's not direct testimony about the events that are on trial here. It's sort of background. Would your knowledge of him make you more likely to believe him or not believe him—

"[The Juror]: Probably can go—

"The Court:—or have no effect?

"[The Juror]:— either way, maybe.

"The Court: What?

"[The Juror]: Probably can go either way.

with him in a park, he was not close to him and did not socialize with him. He also stated that his mother knew Hardy's mother, but he had not seen Hardy in a long time. When asked, "Do you think that knowing Mr. Hardy would influence you toward one side or another?" J stated that he did not know how it would affect him and that it might not influence him. On further inquiry, however, J stated, "Probably, certain things maybe I wouldn't believe him . . . . [J]ust as an example, say he borrowed money and he say he would give it back on a certain day. I wouldn't really look forward to getting it on the certain day." The court then asked J, "Do you have any reason to think that the type of testimony he gave here today—that your knowledge of his history and as a neighbor fourteen or more years ago

---

"The Court: Well, you say you could probably go either way. Does that mean your prior knowledge doesn't influence you when you're deciding whether or not he's telling the truth?

"[The Juror]: No, not really.

"The Court: It doesn't affect you.

"[The Juror]: No.

"The Court: Okay.

"[The Juror]: No.

"The Court: Any questions from the state? . . .

"[The Prosecutor]: When you knew him before, did you form an opinion as to whether or not you found him a believable person or was he just somebody [you] knew from the neighborhood and played basketball with or played sports with?

"[The Juror]: Probably, certain things maybe I wouldn't believe him, so.

"The Court: What kind of things would you not believe him about?

"[The Juror]: I'm trying to think of an example.

"The Court: Can't hear you.

"[The Juror]: I'm trying to think of an example. Well, just as an example, say he borrowed money and he say he would give it back on a certain day. I wouldn't really look forward to getting it on the certain day.

"The Court: Okay. I could see that. There's one area of credibility. But that's sort of a promise for future conduct as opposed to recollection of prior observation. Do you have any reason to think that the type of testimony he gave here today—that your knowledge of his history and as a neighbor fourteen or more years ago would—would affect your decision?

"[The Juror]: No.

"The Court: Okay. Any follow-up questions?

"[Defense Counsel]: No, Your Honor."

would—would affect your decision?" J replied, "No." Thereafter, the court, finding that J had formed a "low opinion" of the state's witness, due to previous interactions, dismissed juror J.[10]

"[T]he trial court has wide latitude in fashioning the proper response to allegations of juror bias. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of an alleged jury misconduct can fairly be characterized as an abuse of its discretion [and] have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred." (Internal quotation marks omitted.) *State* v. *Roman*, 262 Conn. 718, 727, 817 A.2d 100 (2003).

The highly deferential standard we afford to a trial court's decision to dismiss a juror for bias was made evident by our Supreme Court in *Rokus* v. *Bridgeport*, 191 Conn. 62, 71, 463 A.2d 252 (1983). In *Rokus*, our Supreme Court concluded that a trial court properly excused a juror after the juror expressed concern only that he recognized a police officer who was going to testify. Id. Our Supreme Court upheld the decision of the trial court to dismiss the juror even though the juror stated that he did not know the officer very well, had not seen him in a couple of years and that he would not give any undue preference to the officer's testimony. Id., 71–72.

Here, J acknowledged that he recognized Hardy, but had not seen him in many years. Unlike in *Rokus*, however, the juror in this case expressed his concern that

---

[10] The court stated in relevant part: "[J] has a somewhat low opinion of the state's witness, but, then again, [the defendant] was hanging around with him. . . . On balance with [J]'s answers, he has, to the court's satisfaction, formed an opinion on the character, and to a great extent, the credibility of the witness, who is not simply an incidental witness [and] while not a direct eyewitness to the crimes charged, he does testify as to motive, to some extent opportunity, on the day before the homicide in this case."

he may not believe everything Hardy had to say and did not know how his previous interactions with Hardy would influence his opinion of Hardy's testimony. As we have stated, "[i]t is within a judge's discretion to dismiss a juror where . . . that juror possesses a specialized area of knowledge beyond the typical juror that may unduly influence jury deliberations." *State* v. *Mills*, 57 Conn. App. 356, 364, 748 A.2d 891 (2000). Accordingly, the court's dismissal of the juror was a reasonable exercise of its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.