## STATE OF CONNECTICUT *v.* DAVID J. WEINBERG
### (13598)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued March 6—decision released June 5, 1990

*John R. Williams,* for the appellant (defendant).

*Mary H. Lesser,* deputy assistant state's attorney, with whom was *John Connelly,* state's attorney, for the appellee (state).

HULL, J. A jury found the defendant, David J. Weinberg, guilty of murder in violation of General Statutes § 53a-54a.[1] The trial court thereupon sentenced him to a term of life imprisonment.[2] On appeal from this judgment the defendant claims that the trial court should not have: (1) denied his request for an evidentiary hearing on a motion to suppress; (2) found an essential state's witness competent to testify at trial; (3) admitted into evidence certain testimony of an expert witness; (4) denied his request for a mistrial; (5) refused to require the state to prove venue; (6) denied his motions

---

[1] General Statutes § 53a-54a provides in pertinent part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] "[General Statutes] Sec. 53a-35b. 'LIFE IMPRISONMENT' DEFINED. A sentence of imprisonment for life shall mean a definite sentence of sixty years."

for judgment of acquittal; and (7) sentenced him without first affording him the right of allocution. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On the evening of August 3, 1984, Joyce Stochmal was at her home in the town of Seymour, preparing to leave for an overnight stay at her place of employment, the Silver Hills Kennel, located in the town of Ansonia. In contemplation of working at the kennel the next morning, she packed a blue gym bag with the following items: an orange Silver Hills Kennel t-shirt, a pair of Calvin Klein cut-off jeans, a bra, underpants, socks, and a small zippered makeup bag containing an Estee Lauder eyeliner pencil and mascara. Stochmal left her home at approximately 10:30 p.m. and was last seen alive at approximately 10:45 p.m., walking along the nearby Squantuck Road in the direction of Ansonia.

That same night, August 3, 1984, the defendant was at the Prime Time Cafe, a bar located approximately one half mile from Squantuck Road. When he left the bar, he drove along Squantuck Road where he encountered Stochmal. The defendant, thereafter, beat Stochmal about her head and face and stabbed her repeatedly in the back, chest and neck. After inflicting these fatal wounds, he disposed of Stochmal's body in Lake Zoar and then started a fire along the banks of the Pomperaug River where he burned the contents of Stochmal's gym bag.

In the afternoon of the next day, August 4, 1984, the defendant indicated to his girlfriend, D, who had just returned from an overnight stay in New York, that he had discovered a dirt road near his place of employment and he wanted to go see what was there. D agreed to go along, and they drove in the defendant's car to a secluded area along the Pomperaug River. The defendant indicated that he had been at that location the night before and that his car had gotten stuck. D

and the defendant then got out of the car, and the defendant started wading through the shallow water to cross the river. D followed him, and when they reached the opposite bank, she watched as the defendant began digging through the remains of a fire. Twenty to thirty minutes later they left.

On August 4, 1984, the defendant shaved off his beard and, from that date, stopped carrying in public a knife he had previously kept in a sheath on his belt. He also removed a large sticker from the hood of his car and painted the white wheels on his car black.

The defendant became a suspect in the murder of Joyce Stochmal following police investigation of information given to them by D. D, who has a long history of mental illness manifested in such symptoms as auditory and visual hallucinations and delusions, went to the police barracks in Southbury on August 17, 1984, to complain about the psychiatric treatment she was receiving at a particular clinic. In the course of her conversation with the police officers, she told them about the fire site to which the defendant had taken her on August 4. After describing the location of the site, its surroundings, and the details of what had occurred on the afternoon she and the defendant had gone there, she took the police to show them the area.

The police seized the charred remains from the fire site. The following items were found in those remains: an orange fabric that matched the weave, composition, melting point and dye of an orange Silver Hills Kennel t-shirt; a Calvin Klein button; some Calvin Klein rivets; bra hooks and eyes; a zipper fragment consistent with those found on small makeup bags; pieces of an eyeliner pencil that matched the dye and construction of the Estee Lauder eyeliner the victim was known to have used; a twisted wire containing fibers consistent with those found on a mascara brush; charred fabric that appeared to be from a sock; and a blue fiber.

The police interviewed the defendant on August 22, 1984, concerning his activities on the night of August 3, 1984. When asked if he had seen anyone walking along the road as he had left the Prime Time Cafe, the defendant volunteered that he had not driven on Squantuck Road. He explained that, due to transmission problems with his car, he had taken a route home that had fewer hills, a route police later discovered to be 6.7 miles longer than the Squantuck Road route to his home.

After further investigation, two warrants were issued, one for the search of the defendant's body and the other for the search of his residence and car. The police seized from the defendant's apartment a buck knife later determined to be similar in size and configuration to the murder weapon. Seized from the trunk of the defendant's car was a bloody hair fragment consistent with the unusually fine texture of the victim's hair and also a blue fiber that matched in dye and structure a fiber found in the charred remains at the fire site.

I

The defendant first challenges the court's refusal to conduct an evidentiary hearing concerning the truthfulness of the affidavits that served as the factual predicates for the issuance of warrants to search his body, residence and car.[3] Prior to trial, the defendant, as part

---

[3] The first affidavit listed the following items to be seized from the person of the defendant: "fingerprints, palmprints, footprints, head and body hair samples, blood, salvia [sic], physiological fluids and secretions." The second affidavit listed the following items to be searched for and seized from the defendant's residence and car: "blood, saliva, physiological fluids and secretions, hair, fibers, fingerprints, palmprints, footprints, weapons and cases, including knives, cutting instruments and cutting tools, blunt force instruments, dirt, dust and soil, paint samples, glass and plastic fragments, items containing traces of *any* of the above mentioned articles, Nike gym bag, Nike size 6½ sneakers w[ith] maroon/red trim, leather sandals, 'tube socks,' terry cloth sneaker socks, Calvin Klein cutoff dungarees, orange 'Silver Hills Kennel' teeshirt, panty underwear, bra, posted pierce earrings with semi-precious stone or small figurine, hooded sweatshirt with zipper." Both affidavits in question relied upon the same set of averments.

of a motion to suppress, requested that the court conduct a hearing pursuant to *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), to address the defendant's allegations that material facts deliberately or recklessly had been omitted from the affidavits supporting the search warrants and that, had those facts been included, probable cause for the issuance of the warrants would not have existed. The defendant claimed that the following information had been excluded from the affidavits: (1) The police had been informed that D, who provided detailed information that ultimately inculpated the defendant in the murder, suffered from mental problems, including auditory and visual hallucinations; (2) A report written by one investigating officer characterized, in less incriminatory terms than did the affidavits, the statement made by the defendant concerning the road he had taken after leaving the Prime Time Cafe on August 3, 1984; (3) The police had obtained information from a variety of sources indicating that the victim had not been abducted while walking along Squantuck Road, but rather had come in contact with her attacker sometime later and at a different location;[4] and (4) The police had interviewed a woman who provided them with information indicating that another person might have killed the victim.[5] The trial court

---

[4] The defendant specifically cited the following information as supportive of the theory that the victim was not abducted from Squantuck Road: (1) A person interviewed during the police investigation of the murder told the police that on August 3, 1984, at 10:30 p.m. or shortly thereafter, he had driven on Squantuck Road and had seen no one walking on the road; (2) The contents of the victim's stomach at her time of death indicated that she had eaten some food subsequent to leaving her home; (3) A twenty dollar bill was missing from the victim's purse when the purse was recovered; and (4) A person informed the police that she had seen the victim on August 3, 1984, at 11 p.m., at a convenience store located between Squantuck Road and the Silver Hills Kennel.

[5] The defendant also claimed that the affiants had omitted a discrepancy in D's statement concerning the date that the defendant had taken her to

concluded that although certain information might have been excluded from the affidavits, the defendant had not established that he was entitled to a *Franks* hearing. We agree with the court's conclusion.

In *Franks* v. *Delaware,* supra, 155–56, the United States Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, *and* if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." (Emphasis added.) The court in *Franks* mentioned only "a false statement . . . included . . . in the warrant affidavit"; subsequent cases, however, have extended *Franks* to include material omissions from such an affidavit. See, e.g., *United States* v. *Williams,* 737 F.2d 594, 604 (7th Cir. 1984), cert. denied, 470 U.S. 1003, 105 S. Ct. 1354, 84 L. Ed. 2d 377 (1985); *United States* v. *Marin-Buitrago,* 734 F.2d 889, 894–96 (2d Cir. 1984); *United States* v. *Martin,* 615 F.2d 318, 328 (5th Cir. 1980); *State* v. *Stepney,* 191 Conn. 233, 238, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). Although we are not convinced that the defendant made the substantial showing required by the first prong of the *Franks* test, we need not decide the issue since we hold that even had the challenged omissions been included in the affidavits, there was probable cause to support the issuance of the warrants. See *State* v. *Just,* 185 Conn. 339, 359–60, 441 A.2d 98 (1981).

---

the fire site. We do not include this claim in our discussion, because a review of the affidavits reveals that the information referred to by the defendant was in fact not omitted from the affidavits.

"Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . *and* (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched." (Emphasis in original; citations omitted.) *State* v. *DeChamplain,* 179 Conn. 522, 528–29, 427 A.2d 1338 (1980); see *State* v. *Morrill,* 205 Conn. 560, 564–65, 534 A.2d 1165 (1987); *State* v. *Shifflett,* 199 Conn. 718, 745–46, 508 A.2d 748 (1986).

A review of the averments contained within the affidavits, even after the challenged omissions are added, convinces us that there was sufficient probable cause to support the issuance of the warrants to search the defendant's body, residence and car for items connected with the murder. Admittedly, the inclusion of the omitted details would have vitiated the import of the facts establishing that the defendant had encountered the victim on Squantuck Road. The critical connection between the defendant and the murder was not established by those facts, however, but, rather, by the information given to the police by D.[6] Clearly, therefore,

---

[6] The affidavits contain the following averments with respect to the information provided to the police by D. We note that in order to protect D's privacy, we have deleted from the portion of the affidavits here quoted the use of D's name. "12. That on 8/17/84 [D] of . . . contacted Sgt. John Mucherino and advised him that she wanted to talk about the murder in Southbury and the behavior of her boyfriend. [D] was directed to come to the Southbury Barracks and was then interviewed by Det. George Hamila, and thereafter by affiant O'Mara. In a written statement, [D] indicated that she is presently living at . . . with her boyfriend, David J. Weinberg, age 26. [D] has known Weinberg for approximately three years, and has lived with him for about 2½ years.

"On Friday 8/3/84 at approximately 1200 hours [D] cashed a Social Security disability check and used the proceeds to buy a bus ticket to Oneonta, NY to visit relatives. [D] had had an argument with Weinberg, and went to NY expecting to move there. On Saturday 8/4/84 she rented a U-Haul truck and drove to her mother's home in Oxford for some belongings. David Weinberg came to the house at approximately 1530 hours and asked her

D's credibility was a significant issue and certainly would have been questioned had the affiants included

to go for some ice cream at a shop in Woodbury, CT. Enroute, Weinberg told her of a place he had found near the print shop where he works, and said he wanted to show her.

"Weinberg further stated that he had been there earlier that day, and had gotten his car stuck. He explained to [D] that he had been at the Prime Time Cafe until approximately 2230 hours on 8/3/84, and then was 'up all night worrying about her,' but did not elaborate as to how he had found the place or at what time. Weinberg drove her to a dirt road off of South Pomperaug Road Woodbury, CT directly across from Weinberg's place of employment, the Village Print Shop. They proceeded down the road to the Pomperaug River, and Weinberg got out of the car and forded the stream with his shoes on. Weinberg went to a camp fire scene on the opposite river bank and began digging through the remains, throwing debris into the water. [D] joined Weinberg and asked him what he was doing, and he replied he wanted to make sure the fire was out. [D] told Weinberg she did not like the place, and they left. Weinberg then drove through Newtown, CT to a steel bridge over Lake Zoar. Weinberg stopped the car, and walked onto the bridge. He and [D] watched two young men jump into the lake from the bridge. Weinberg stated that he too wanted to jump into the water but [D] told him he would hurt his back so they then left. As they proceeded down River Rd. in Southbury towards Interstate 84, there were two State Police cruisers stopped on the road. Weinberg asked a Trooper what was wrong and was directed to continue on. Weinberg drove down the road, turned around and parked. He got out of the car, spoke with some bystanders, and came back to the car telling [D] that a body had been pulled from the lake. They then left the area, and went back to [D's] mother's house. Weinberg and [D] then returned the U-Haul truck to a depot in Milford, CT, went to . . . and stayed home the rest of the evening.

"13. That while at the Troop a recording was played for [D]. On 8/10/84 at approximately 2330 hours an unidentified male had called the Southbury Barracks and stated, 'I (inaudible) the girl in Southbury.' The inaudible word sounds to be 'got' or 'cut.' The call had been received on the 888 exchange, a local call from the Oxford/Seymour area, and had been recorded as part of police procedure on the Dictaphone Model 4000 recorder. A copy of this recording was made and [D] listened to it. After hearing the voice she stated, 'that's David,' referring to David Weinberg.

"14. That on 8/17/84 [D] agreed to show Det. Hamila and SPW Duggan the area of the Pomperaug River where David Wienberg took her on 8/4/84 to view the fire scene. After the area was identified, the remains of the camp fire were collected on 8/18/84 for additional processing at the CSP Forensic Lab. Plainly visible while the material was gathered was a Calvin Klein dungaree brass type button and zipper, two bra hooks, some type of ribbed material with a colored band similar to a 'tube' sock, and various

in the affidavits the information concerning her mental illness. We conclude, however, that the affidavits contained sufficient corroboration of D's statement to warrant a conclusion that D's information was credible. It is particularly significant that the location and existence of the fire site were corroborated by a number of police officers. Likewise, the change in appearance and behavior of the defendant after August 3, 1984, was corroborated by a variety of sources. " 'The theory of corroboration is that a statement which has been shown true in some respects is reasonably likely to be true in the remaining respects.' *State* v. *Jackson,* [162 Conn. 440, 447, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972)]." *State* v. *Just,* supra, 361.

A fair reading of the affidavits, including the challenged omissions, discloses the following facts: The body of Joyce Stochmal, who had last been seen alive on the night of August 3, 1984, was found in shallow water in Lake Zoar on August 7, 1984. Her death was determined to have been caused by multiple stab wounds from a knife or other cutting instrument. On August 4, 1984, the defendant took D to a secluded area along the banks of the Pomperaug River that was near his place of employment. He indicated that he had been there in his car earlier that day. When D and the defendant got out of the car, the defendant waded

pieces of charred material. Numerous Kool cigarette butts were also recovered around the fire scene. [D] stated that David Weinberg smoked Kool cigarettes. Also present was the odor of some type of petroleum base accelerant.

"15. That [D] further stated that David Weinberg has been 'acting strange' since she returned from NY on 8/4/84. [D] stated that on the evening of 8/4/84 Weinberg shaved off his beard. Weinberg had had his beard trimmed on 8/3/84 and was apparently pleased with his appearance but shaved off the beard without explanation. He also spray painted the wheel rims on his 1969 blue Chevy Nova CT reg. 147-AJX for no apparent reason. [D] also noted that Weinberg has stopped carrying a buck knife she knows him to always have, and has left it on his bedroom dresser. . . ."

through shallow water to the opposite bank and then dug through the remains of a fire, throwing debris from those remains into the water. Police found at that fire site charred remains consistent with some of the items that the victim had packed in her gym bag. Also on August 4, 1984, the defendant changed the appearance of both his face and his car and stopped carrying a knife that he had formerly kept in a sheath on his belt. Soon after Stochmal's body was found, a caller contacted the state police barracks announcing that he had "got" or "cut" the "girl in Southbury." Three people independently identified the voice of the caller as that of the defendant.

We conclude that, even had the challenged omissions been included in the affidavits, the facts contained therein would have been sufficient to support a finding of probable cause to issue the search warrants. Accordingly, the defendant was not entitled to an evidentiary hearing pursuant to *Franks* v. *Delaware,* supra.

## II

The defendant next claims that the trial court improperly admitted into evidence the testimony of D. Prior to the admission of her testimony, the state and the defendant stipulated to the appointment of an independent psychiatrist, Walter Borden, for the purpose of evaluating D's competence to testify at trial. Borden thereafter reviewed D's voluminous psychiatric record and a transcript of the testimony D had given at the probable cause hearing and also conducted a psychiatric examination of D at his office. In both Borden's written report and his testimony at the hearing concerning this matter, he concluded that D was not competent to testify at trial. His conclusion, as he explained at the hearing, was based upon his clinical diagnosis that D suffered from "severe chronic paranoid schizophre-

nia" that was manifested in such symptoms as uncontrollable delusions and auditory and visual hallucinations, including hallucinations about the defendant. The trial court, however, determined that, notwithstanding Borden's clinical diagnosis, it was satisfied, having listened to D's proffered testimony and the substance of Borden's testimony, that D met the legal requirements for competency. The defendant argues that D's testimonial capacity was so impaired by her severe mental illness that her testimony should not have been admitted at trial. We do not agree.

This court has stated that "[i]n determining the competency of a proposed witness the trial court should consider *the capacity* of the witness to receive correct sense impressions, to comprehend the facts to be developed, to recollect and narrate facts intelligently, and to appreciate the moral duty to tell the truth." (Emphasis added.) *State* v. *Boulay,* 189 Conn. 106, 108, 454 A.2d 724 (1983). We have never, however, specified the measure of "capacity" required for a determination of competency. On this issue, we look for guidance, as did the trial court in the instant case, to the federal courts' approach to the issue of witness competency.

Rule 601 of the Federal Rules of Evidence provides that, except where otherwise provided by the rules, "[e]very person is competent to be a witness . . . . " Pursuant to this rule, the federal courts treat questions of competency as simply one aspect of the credibility of a witness.[7] 3 J. Weinstein & M. Berger, Evidence § 601[05]. Federal Rule § 601 has not been construed, however, as eliminating a court's power to prevent a

---

[7] The Advisory Committee's note to Rule § 601 provides: "Standards of mental capacity have proved elusive in actual application. . . . A witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility, subject to the judicial authority to review the sufficiency of the evidence." See 10 J. Moore, Federal Practice § 601.6.

witness from testifying. To the contrary, a court maintains the obligation to ensure that a witness' testimony meets the minimum standard of credibility necessary to permit a reasonable person to put any credence in that testimony.[8] As noted commentators have acknowledged: "In making this determination the court will still be deciding competency. It would, however . . . be more accurate to say that the court will decide . . . minimum credibility. This requirement of minimum credibility is just one aspect of the requirement of minimum probative force—i.e., relevancy. Regardless of terminology, the trial judge may exclude all or a part of the witness' testimony on the ground that no one could reasonably believe the witness could have observed, remembered, communicated or told the truth with respect to the event in question." 3 J. Weinstein & M. Berger, supra, § 601[01].

We conclude that Rule § 601, as applied by the federal courts, establishes a reasoned approach to determining the admissibility of a witness' testimony. We adopt, therefore, the rule that where the competency of a witness is challenged, the threshold question to be answered by the court is whether the testimony of that witness is minimally credible. If the testimony of a witness passes the test of minimum credibility, and is otherwise relevant, the testimony is admissible and the weight to be accorded it, in light of the witness' inca-

---

[8] See, e.g., *United States* v. *Van Meerbeke*, 548 F.2d 415 (2d Cir. 1976), cert. denied, 430 U.S. 974, 97 S. Ct. 1663, 52 L. Ed. 2d 368 (1977) (trial court who noticed that witness had swallowed a small amount of opium while testifying refused to declare a mistrial because the court found that the witness had been coherent and that the jury could understand him; appellate court found that under these circumstances the witness' credibility was properly left to the jury); *United States* v. *Banks*, 520 F.2d 627, 630 (7th Cir. 1975) ("[c]ompetency of a witness to testify, as distinguished from the issue of credibility, is a limited threshold decision by the trial judge as to whether a proffered witness is capable of testifying in any meaningful fashion whatsoever").

pacity, is a question for the trier of fact. As we have stated in the past, " '[t]he competency of a witness is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law.' *State* v. *Manning,* 162 Conn. 112, 115, 291 A.2d 750 (1971)." *State* v. *Canady,* 187 Conn. 281, 291–92, 445 A.2d 895 (1982).

With this rule as our framework, we conclude that the trial court did not abuse its discretion in finding the witness competent to testify at trial. Borden's conclusion that the witness was not competent to testify was, as he explained, based upon his clinical diagnosis of D's mental illness, although he acknowledged that her testimony, if independently corroborated, might be credible. The court focused not on Borden's clinical diagnosis, but rather on the substance of Borden's testimony. As the court explained, the substance of that testimony revealed that, despite D's severe mental illness, her cognitive memory was intact, her factual reports tended to be accurate, and she understood the moral duty of truthfulness. The court, noting that D's proffered testimony involved a factual account of a trip to the fire scene with the defendant for which there was corroboration, found D competent to testify. We cannot say that under these facts the court abused its discretion in determining that D possessed sufficient powers of observation, recollection, narration and truthfulness to meet the threshold requirement of minimum credibility.

The weight to be accorded D's testimony in light of her mental illness, therefore, was for the jury to decide. Here, the jury had all the facts necessary for a reasoned credibility determination of D's testimony. The defendant cross-examined D extensively about her mental illness, her various hospitalizations, and her medications. The defendant also presented testimony from Borden concerning D's mental illness and introduced as full

exhibits fifty-three hospital and psychiatric records of the witness. Accordingly, we find that the trial court properly admitted D's testimony.

## III

We turn next to the defendant's claim that the trial court should not have admitted into evidence the opinion of the state medical examiner, Wayne Carver, that the victim's fatal stab wounds were inflicted by the knife seized from the defendant's residence or an object similar in size and configuration to that knife. The gravamen of the defendant's claim is that Carver's opinion was not based upon reasonable probability and thus failed to meet the threshold requirement for admissibility. We do not agree.

This court stated in *Healy* v. *White,* 173 Conn. 438, 443, 378 A.2d 540 (1977), that "[a]n expert witness is competent to express an opinion, even though he or she may be unwilling to state a conclusion with absolute certainty, so long as the expert's opinion, if not stated in terms of the certain, is at least stated in terms of the probable, and not merely the possible." In the present case, an offer of proof was made outside the presence of the jury to establish the admissibility of Carver's opinion concerning the relationship between the defendant's knife and the victim's wounds. During that offer of proof, Carver offered candid explanations concerning the limitations of scientific or medical expertise in measuring and otherwise evaluating flesh wounds. A careful reading of the record indicates, however, that Carver, in both form and substance, stated in terms of the probable his opinion that the victim's wounds were consistent with having been caused by either the defendant's knife or an object of similar size and configuration. This testimony thus met the threshold requirement of admissibility established in *Healy* v. *White,* supra.

The jury was thereafter convened and Carver was again asked to give his opinion concerning the relationship between the defendant's knife and the victim's wounds. A careful review of the record again reveals that Carver stated his opinion, both in form and substance, in terms of the probable. He repeated with respect to each of the wounds individually that within reasonable medical or scientific probability it was his opinion that the "wound was caused by either this object [the defendant's knife] or an object similar in size and configuration." This testimony also met the threshold requirement of admissibility established in *Healy* v. *White,* supra.

The opinion expressed by Carver before the jury was inconsistent with some of his expressed views, during the offer of proof, concerning the limited capacity of scientific or medical expertise to determine, with the requisite certainty, a causal relationship between a particular flesh wound and a particular weapon. The defendant, however, did not contest the admissibility of the opinion on those grounds, but rather limited his challenge, as he does on appeal, to the admissibility of the opinion under *Healy* v. *White,* supra. The defendant attacked arguable inconsistencies in Carver's testimony through cross-examination. Our review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection. *State* v. *Sinclair,* 197 Conn. 574, 579, 500 A.2d 539 (1985); *State* v. *Rothenberg,* 195 Conn. 253, 262, 487 A.2d 545 (1985); *State* v. *Braman,* 191 Conn. 670, 684–85, 469 A.2d 760 (1983). Under the facts here presented, we cannot say that the trial court abused its discretion in admitting Carver's opinion. See *State* v. *Biller,* 190 Conn. 594, 617, 462 A.2d 987 (1983).

## IV

The defendant next challenges the trial court's denial of his request for a mistrial. The gravamen of the

defendant's claim is that certain courtroom events were so inherently prejudicial that a mistrial was necessary in order to protect his federal and state constitutional rights to a trial before an impartial jury. We do not agree.

In order to address this claim, it is necessary first to narrate in some detail the relevant events that occurred in the courtroom. During the final moments of the defendant's closing argument, some members of the courtroom audience made gestures and facial expressions, indicating disapproval of the defendant and his counsel. The victim's mother then stood with her hands over her head and directed mock applause toward defense counsel. In response to this conduct, the defendant, in the absence of the jury, moved for a mistrial, claiming that the jury could not remain impartial given the "lynch-mob atmosphere" of the courtroom. Reserving decision on the defendant's motion, the court stated that it would give the jury a cautionary instruction concerning the events that had transpired and would permit the defendant, as an exception to the rules, to make a second closing argument after the state's final summation.

The court thereafter convened the jury and addressed them as follows: "I want to speak to you now about what I thought was some inappropriate action by people in the audience. When [defense counsel] was finishing his summation, people in the audience were shaking their heads and doing things that I thought were totally and absolutely inappropriate. I want you to disregard anything you may have seen and not let it influence you one iota." The court continued its remarks, admonishing the jurors to focus only on the evidence presented during the trial and repeating several times its instruction that the jury disregard the "reprehensive" audience conduct. The court then concluded by explaining to the jury that, because the defendant was

entitled to the presumption of innocence and to fair treatment, he would be given an opportunity to address the jury a second time following the state's summation.

The court subsequently denied the defendant's request for a mistrial, stating: "I as the Constitutional officer have the obligation to have a fair trial. I have watched this jury. They have been attentive. They are intelligent. I have explained at length, told them how upset I was and that they are to disregard it and I believe they have a power to listen to me. . . . I think the case is one that can fairly go to the jury."

Following the court's final instructions to the jury, including a general charge concerning the jury's duty to reach a verdict based solely on the evidence presented at trial, the defendant renewed his request for a mistrial. In reconsidering the motion, the court noted that the inappropriate spectator conduct had occurred in the last sixty to ninety seconds of the defendant's first closing argument. Given the court's instructions to the jury and the fact that the defendant was given a second opportunity to address the jury, the court determined that the trial had been a fair one and that a mistrial was not warranted.

On appeal, the defendant argues that despite the court's efforts to mitigate the prejudice resulting from the courtroom events, the "[d]isruption of trial by a mob demanding revenge and ridiculing the defense is the kind of assault upon our judicial system which simply cannot be cured by a mere cautionary instruction or rerun of a trial segment." He maintains, therefore, that the trial court should not have denied his request for a mistrial. We are not persuaded.

It is without question that due process requires that a criminal defendant be given a fair trial before an impartial jury. U.S. Const., amend. XIV; Conn. Const.,

art. I, § 8;[9] *State* v. *Rodriguez,* 210 Conn. 315, 324–25, 554 A.2d 1080 (1989); *State* v. *Brigandi,* 186 Conn. 521, 542, 442 A.2d 927 (1982). The United States Supreme Court has noted, however, that "the Constitution 'does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' " *Rushen* v. *Spain,* 464 U.S. 114, 118, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983), reh. denied, 465 U.S. 1055, 104 S. Ct. 1336, 79 L. Ed. 2d 730 (1984), quoting *Smith* v. *Phillips,* 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). In the vast majority of cases, therefore, the determination of whether the defendant has been deprived of his right to an impartial jury will depend upon how the jury interprets and expectedly will react to the communication made. *United States* v. *Williams,* 822 F.2d 1174, 1189 (D.C. Cir. 1987). The trial court, which has a first-hand impression of that jury, "is generally in the best position to evaluate the critical question of whether the juror's or jurors' exposure to improper matter has prejudiced a defendant. See, e.g., *United States* v. *Wiley,* 846 F.2d 150, 157 (2d Cir. 1988); *State* v. *Asherman,* [193 Conn. 695, 736, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)]. . . . Where, as here, the impartiality of the jury was challenged by a motion for mistrial, the trial court's determination will be reversed only where it can fairly be said that it abused its discretion in denying the mistrial. See generally *United States* v. *Wiley,* supra, 158; *State* v. *Brigandi,* supra, 543–44. In noting that a trial court has wide discretion in passing on

---

[9] We have held that the due process clauses of both the United States and Connecticut constitutions have the same meaning and impose similar limitations. *State* v. *Rodriguez,* 210 Conn. 315, 324–25, 554 A.2d 1080 (1989); *State* v. *Brigandi,* 186 Conn. 521, 542–43, 442 A.2d 927 (1982).

motions for mistrial, we have said that ' "[t]he general principle is that a mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated." ' *State* v. *Brigandi,* supra, 543; *State* v. *Cavros,* 196 Conn. 519, 526, 494 A.2d 550, cert. denied, 474 U.S. 904, 106 S. Ct. 233, 88 L. Ed. 2d 232 (1985); *State* v. *Marra,* 195 Conn. 421, 436, 489 A.2d 350 (1985)." *State* v. *Rodriguez,* supra, 326–27.

In the instant case, we cannot say that the conduct at issue, after the countermeasures administered by the court, so jeopardized the defendant's right to a fair trial that the court abused its discretion in denying his motion for a mistrial. The trial court clearly considered the conduct exhibited by members of the courtroom audience to be potentially prejudicial to the defendant. The court, therefore, took prompt and careful steps to defuse that risk of prejudice. First, the court repeatedly cautioned the jury to disregard the spectator misconduct and to decide the case only on the evidence presented at the trial. Second, the court, as an exception to the rules, gave the defendant a second opportunity to address the jury, one that was not disturbed by a courtroom demonstration. After having taken these actions, the court explained that it had carefully observed the jury, both before and after the ninety second, nonverbal demonstration conducted by members of the courtroom audience, and it was satisfied that the jury had the "power" to follow the instructions it had given.[10] Since " '[t]he trial judge is uniquely qualified

---

[10] The District of Columbia Circuit Court of Appeals has stated that among the factors to be considered in assessing juror bias are "the nature of the communication, the length of the contact, the possibility of removing juror taint by a limiting instruction, and the impact of the communication on the juror[s] involved . . . ." *United States* v. *Williams,* 822 F.2d 1174, 1188–89 (D.C. Cir. 1987). The trial court's remarks in the instant case indicate that it considered each of those factors.

to appraise the probable effect of information on the jury, the materiality of the extraneous material, and its prejudicial nature"; *United States* v. *Steele,* 785 F.2d 743, 746 (9th Cir. 1986), quoting *United States* v. *Bagnariol,* 665 F.2d 877, 885 (9th Cir. 1981), cert. denied, 456 U.S. 962, 102 S. Ct. 2040, 72 L. Ed. 2d 487 (1982); we accord considerable deference to that conclusion. We, therefore, cannot say that the trial court abused its discretion in determining that the defendant's right to a fair trial was not impaired and in denying his motion for a mistrial.

## V

The substitute information, filed prior to trial, alleged, inter alia, that the defendant had murdered the victim "at or near the town of Southbury." The defendant asserts that the location of the death was therefore an essential element of the crime with which he was charged. Accordingly, he challenges the court's refusal to require the state to meet its burden of proof on that element.[11] We do not agree that the location of the death was an essential element of the crime charged.

Our discussion in *State* v. *Morrill,* 197 Conn. 507, 551–53, 498 A.2d 76 (1985), is dispositive of this issue. " 'When the state's pleadings have "informed the defendant of the charge against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise, and were definite enough to enable him to plead his acquittal or conviction in bar of any future prosecution for the same offense, they have performed their constitutional duty." *State* v. *Sumner,* 178 Conn. 163, 168, 422 A.2d 299 (1979).' *State* v. *Vin-*

---

[11] The court denied both the defendant's motion for judgment of acquittal, in which he challenged, inter alia, the state's failure to prove the location of the death, and the defendant's request that the jury be instructed that the state had the burden of proving that location.

*cent,* 194 Conn. 198, 205, 479 A.2d 237 (1984). The inclusion in the state's pleading of additional details concerning the offense does not make such allegations essential elements of the crime . . . ." Id., 551. We discussed in *Morrill* the well established rule in this state that, in a criminal prosecution, it is not essential that the crime be proved to have been committed on the precise date alleged; ordinarily it is sufficient that the prosecution prove the commission of the crime charged at any time prior to the date of the complaint and within the period fixed by the statute of limitations. Id., 552; see also *State* v. *Orsini,* 187 Conn. 264, 274, 445 A.2d 887, cert. denied, 459 U.S. 861, 103 S. Ct. 136, 74 L. Ed. 2d 116 (1982); *State* v. *Bitting,* 162 Conn. 1, 8, 291 A.2d 240 (1971); *State* v. *Lorusso,* 151 Conn. 189, 191, 195 A.2d 429 (1963). By analogy, we concluded that " 'the fact that the place of death is unknown or that there may be a variance in the proof thereof will not be fatal unless it is made to affirmatively appear that the accused was mislead [sic] or prejudiced thereby. No person should escape punishment for murder because he is so clever as to conceal . . . the place where the victim was killed or died.' See generally annot., 59 A.L.R.2d 901 § 10." *State* v. *Morrill,* supra, quoting *State* v. *Carrier,* 235 Ind. 456, 463–64, 134 N.E.2d 688 (1956).

We conclude that the location of the victim's death was not an essential element of the crime with which the defendant was charged. Moreover, in the instant case, we are unable to discern how the defendant could have been misled or prejudiced by the fact that the precise location of the death was unknown.[12] Accord-

---

[12] The defendant also makes reference to General Statutes § 51-352c (a) that provides: "A criminal prosecution shall not fail by reason of the fact that the evidence may disclose the crime to have been committed in a town or judicial district adjoining that alleged in the indictment or information." We note that the defendant was tried in the Waterbury judicial district and that all of the evidence presented concerned events that took place

ingly, the trial court properly refused to require the state to prove that location.

## VI

The defendant next challenges the sufficiency of the evidence presented at trial. At the close of the state's evidence, at the close of all the evidence, and again after the verdict, the defendant moved for a judgment of acquittal. Each of the motions was denied by the trial court. On appeal, the defendant renews his claim that there was insufficient evidence to sustain the verdict on the charge of murder. We are not persuaded.

"In accordance with well established principles, appellate analysis of a claim of insufficiency of the evidence requires us to undertake a twofold task. 'We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct.' *State* v. *Sinclair,* 197 Conn. 574, 576, 500 A.2d 539 (1985), and cases there cited." *State* v. *Rollinson,* 203 Conn. 641, 665–66, 526 A.2d 1283 (1987).

The elements of intentional murder with which the defendant was charged under General Statutes § 53a-54a are (1) intent, (2) causation and (3) death by killing as

---

in the Waterbury judicial district where the charred remains of the victim's possessions were found, the adjoining district of Danbury where the body was found, and the adjoining district of Ansonia-Milford where the victim was last seen alive. Sufficient evidence was thus presented to bring the prosecution within the language of § 51-352c (a). See *State* v. *Morrill,* 197 Conn. 507, 553, 498 A.2d 76 (1985).

opposed to death by accident or suicide. *State* v. *Avcollie,* 178 Conn. 450, 460, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980), aff'd, 188 Conn. 626, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983). The disputed elements in the instant case were "intent" and "causation" upon which the state presented the following evidence. The victim was last seen alive on August 3, 1984, at approximately 10:45 p.m., walking along Squantuck Road. On that same night, the defendant was at a bar located one half mile from Squantuck Road. He left the bar sometime after 10 p.m. and did not arrive at his home until sometime after 1:20 a.m. on August 4. When later asked by the police whether he had seen anyone walking along the road as he had left the bar, the defendant *volunteered* that he had not driven on Squantuck Road.

In the afternoon of August 4, the defendant took D to a secluded area along the banks of the Pomperaug River, located approximately one quarter mile from his place of employment. He explained to D that he had been there the night before. The defendant and D then waded across the river where the defendant stirred the ashes from a fire. In those ashes were the charred remains of some of the victim's possessions. Also on August 4, 1984, the defendant shaved his beard and stopped carrying a knife that he had previously kept in a sheath on his belt. Soon thereafter the defendant painted the white wheels on his car black and removed a large identifying sticker from his car. Finally, pursuant to a search warrant, the police seized from the trunk of the defendant's car evidence linking the defendant to the fire site and to the victim, and from the defendant's residence a knife that was similar in size and configuration to the murder weapon.

Viewing this evidence in the light most favorable to sustaining the verdict, we cannot say as a matter of

law that the jury as the trier of fact could not reasonably have concluded that the defendant murdered Joyce Stochmal. " 'It is within the province of the trier of fact to draw reasonable and logical inferences from the facts proven, but it may not resort to speculation and conjecture. *State* v. *Kish,* 186 Conn. 757, 768, 443 A.2d 1274 (1982); *State* v. *Tucker,* 181 Conn. 406, 418, 435 A.2d 986 (1980). Any inferences drawn must be rational and founded upon the evidence. *State* v. *Clemons,* 168 Conn. 395, 401, 363 A.2d 33, cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975). The jury may base an inference on facts it finds as the result of other inferences. *State* v. *Gabriel,* [192 Conn. 405, 425, 473 A.2d 300 (1984)]; *State* v. *McGinnis,* 158 Conn. 124, 130, 256 A.2d 241 (1969) . . . . ' " (Citations omitted.) *State* v. *Williams,* 202 Conn. 349, 355, 521 A.2d 150 (1987), quoting *State* v. *Little,* 194 Conn. 665, 673, 485 A.2d 913 (1984). The jury could fairly have inferred the following. The defendant encountered the victim on Squantuck Road and thereafter inflicted the fatal stab wounds upon her. He disposed of the body, but failed to dispose at the same time of her personal effects that were in his possession. He, therefore, went to a secluded area near his place of employment, waded across the river to the opposite shore and burned the items. The following day he returned to the fire site to make sure, in the light of day, that no evidence of the victim's possessions remained. Thereafter, he engaged in verbal and nonverbal conduct, such as changing both his personal appearance and his car's appearance and offering unsolicited details to the police, that can fairly be inferred to have been influenced by the criminal act. As we have stated, " '[t]he state of mind which is characterized as "guilty consciousness" or "consciousness of guilt" is strong evidence that the person is indeed guilty; 2 Wigmore,

Evidence (3d Ed.) § 273 . . . .' " *State* v. *Reid,* 193 Conn. 646, 655, 480 A.2d 463 (1984).

We conclude that the cumulative effect of the evidence presented and the permissible inferences drawn therefrom were sufficient to justify the jury in finding the defendant guilty beyond a reasonable doubt of murder. The trial court, therefore, properly denied the defendant's motions for judgment of acquittal.

## VII

We consider finally the defendant's claim that he was denied his right of allocution. At the defendant's sentencing hearing, his counsel spoke at length on his behalf and included as part of the presentation to the court a reading of letters from the defendant's friends, employer and priest. The defendant argues that although his counsel was afforded the opportunity to address the court at the sentencing hearing, the mandates of our rules of practice were not satisfied. Practice Book § 919 provides in pertinent part: "Before imposing a sentence . . . the judicial authority shall . . . conduct a sentencing hearing as follows . . . (3) The judicial authority shall allow the defendant a reasonable opportunity to make a personal statement in his own behalf and to present any information in mitigation of the sentence. . . . " The defendant claims that § 919 requires a trial court, prior to sentencing, to address a defendant *personally* to ascertain whether he desires to make a statement in his own behalf. Accordingly, argues the defendant, because the court in the instant case did not make such an inquiry, his sentence must be reversed. We decline to consider the requirements and limitations of the opportunity afforded by § 919, because the defendant's claim was not raised below. See Practice Book § 4185.[13]

[13] Practice Book § 4185 provides in pertinent part: "The supreme court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial."

During the sentencing hearing, neither the defendant nor his counsel requested that he be given the opportunity to make a personal statement and took no exception to the particular procedures followed by the court during the hearing. Moreover, a review of the record reveals that all the information communicated to the court indicated that the defendant and his counsel had discussed fully the hearing and any rights or consequences emanating therefrom and had carefully charted the course to be followed during the hearing. On appeal, the defendant does not maintain that his claim is reviewable as an exceptional circumstance within the doctrine of *State* v. *Golding,* 213 Conn. 233, 238–42, 567 A.2d 823 (1989), and *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), or under the plain error rule of Practice Book § 4185. A departure from our general rule that issues raised for the first time on appeal are not afforded review is, therefore, not warranted.

The judgment is affirmed.

In this opinion the other justices concurred.