[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The defendant has made a claim of juror misconduct based on information secured from Juror Robert Schmidt.
 I
When interviewed by two private investigators, Schmidt indicated in a taped interview, that the other eleven jurors used considerable pressure over a number of days trying to persuade him to join them in a unanimous jury verdict finding Mrs. Tomasko guilty of murder. Although she raised it, the defendant has quite properly abandoned this claim. "Testimony concerning. . .the persuasive tactics of fellow jurors is clearly excluded under CT Page 4255-K [our] rule, and it would have been highly improper to allow testimony of the sort proposed. . . ." State v. Avcollie,188 Conn. 626, 643. See also, Practice Book § 871. Moreover, based upon Federal Rule of Criminal Procedure § 311(d), which is substantially the same as our Practice Book rule § 869,[1] the 9th Circuit has held that "once a verdict has been returned, generally it is no longer impeachable for lack of unanimity. . . . After a jury has given its verdict, has been polled in open court and has been discharged, an individual's change of mind or claim that he was mistaken or unwilling in his assent to the verdict comes too late." U.S. v. Williams, 990 F.2d 846,851 (8th Cir.). See also, U.S. v. Crosby, 294 F.2d 928 (2nd. Cir.).
Juror Schmidt returned a guilty verdict with his fellow jurors in open court. During the court's poll of the jury, Schmidt readily agreed with the verdict.
 II
Following the dictates of State v. Brown, 235 Conn. 502, the court has considered the private interest involved in the defendant's constitutional right to a trial before an impartial jury. It has also viewed the risk of deprivation of that right by the potentially prejudicial nature of the alleged misconduct and the nature and degree of alleged juror involvement. Further, it has considered the state's interest in the finality of judgments and the problems of protecting the privacy and integrity of jury deliberation, the prevention of juror harassment, and the maintenance of public confidence in the jury system. The question of prejudice is critical here. In this regard the court considered the claimed magnitude of jury deviation from its proper role, the degree of possible deprivation of constitutional and statutory protections, and the likelihood that impropriety influenced the jury's verdict. See State v. Asherman, 193 Conn. 695,739 (1985). A review of these considerations has convinced the court that the magnitude of juror deviation was slight, that there was no perceptible breakdown of constitutional or statutory protection, and that the jury's verdict was not influenced by impropriety.
 III
The defendant's main thrust on her claim of juror misconduct rests on an allegation that one juror brought information he CT Page 4255-L received indirectly from a newspaper article into the jury room which concerned the "Chip Smith" charge. Mr. Schmidt testified that an unnamed juror was told by his brother that the newspaper said that the judge intended to give the jury a supplementary "Chip Smith" charge; and further, that a "Chip Smith" charge meant that the minority had to give in to the majority. The Connecticut Post article actually stated that the charge requested "those in the minority to strongly consider majority opinion."
The defendant argues: 1) The jury stopped deliberating at that point and only discussed the meaning of an erroneous version of the "Chip Smith" charge; 2) The incident meant that extraneous "evidence" was brought into the jury room. The State contends that the court's rendition of the "Chip Smith" charge the next court day (Monday) left no doubt as to the meaning of the charge; and that between Thursday (the day before the alleged erroneous information about the charge was given out by the juror) and Monday (the day the charge was actually given) there was absolutely no change in the composition of the 11-1 vote for conviction. Clearly, the State argues, the proper charge disabused the jury of any improper notions to which it was subjected, and no harm was done to the defendant's cause.
First, the jury did not cease deliberating, as charged. Both Schmidt and the jury foreman testified that they did in fact deliberate on Friday, Monday and Tuesday when they delivered their verdict. It is interesting that the jury foreman, Merton Conley, testified he was unaware that information about a "Chip Smith" charge came into the jury room prematurely. Conley was a believable witness. It is no secret that when twelve people assemble in a deliberation room, the likelihood of multiple conversations taking place over a long day is high. It seems obvious that not all the jurors discussed the impending "Chip Smith" charge. In any event, there is no evidence that deliberations ceased — in fact, there is agreement that they did continue.
Second, it is very clear that no extraneous "evidence" came into the jury room. Assuming for the sake of argument, that Schmidt's testimony was totally accurate, the worst thing that happened was that one juror brought in second-hand knowledge about a newspaper story that suggested that the court was prepared to give a "Chip Smith" charge soon — and he embellished it with a mistaken notion of what it meant. That is CT Page 4255-M not evidence. That charge had not yet been given. It did not concern the guilt or innocence of the defendant.
Moreover, the very next court day, the court gave the actual "Chip Smith" charge and Schmidt admitted that he understood that charge; and also that the court's charge clearly showed that the previous speculation about what the charge might consist of was not accurate. Schmidt was the lone holdout before, during and after these events. The other eleven jurors had already decided the defendant was guilty. It is impossible to see how the defendant's case was harmed in any way. No evidence entered the jury room — only foolish speculation which did not sway this lone holdout — or anyone else. The next day, Schmidt joined the majority in voting for conviction. He testified that he was swayed by a good argument made by a very intelligent juror after the "Chip Smith" charge: that he had done his very best to sway the majority with very good arguments, but that he failed, and that now it was time for him to join them.
Third, there is no doubt that the volunteered speculation about an impending "Chip Smith" charge did not affect the defendant in any way. Schmidt made it clear he recognized the differences between the speculation and the actual charge. He testified he based his actions on the actual charge, not on the earlier comments about it. The court finds that the incident, such as it was, was not harmful to the defendant. Not only did it have no effect on any jurors, but any effects it might have had were quickly and totally dissipated when the court gave the correct charge. The court is satisfied, beyond any reasonabledoubt, that the defendant could not be, and was not, prejudiced by what is alleged to have occurred. Eleven jurors voted for conviction before the alleged conversation took place. Eleven jurors were still for conviction the next court day. To the degree that anyone might have been confused by erroneous information, the court's charge soon after gave the jury the proper information and quite successfully cleared the air.
"[N]ot every irregularity in a juror's conduct compels reversal." State v. Asherman, 193 Conn. 695, 736. The law recognizes that jurors are human. Our state and federal supreme courts have both noted that "the Constitution does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." State v. Weinberg, 215 Conn. 231, CT Page 4255-N 249, quoting Rushen v. Spain, 464 U.S. 114, 118. "In the vast majority of cases, therefore, the determination of whether the defendant has been deprived of his right to an impartial jury will depend upon how the jury interprets and unexpectedly will react to the communication made." State v. Weinberg, supra.
The defendant points to the discussions of the jury. But our Supreme Court's rule "excludes as immaterial, evidence as to the expressions and arguments of the jurors in their deliberation and evidence as to their own motives, beliefs, mistakes and mental operations generally in arriving at their verdict." (Emphasis added.) Aillon v. State, 168 Conn. 541, 550 (1975), citing McCormick, Evidence (2nd Ed.) § 68, p. 148. Further, P.B. § 871 states: "Upon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined." The rule is eminently reasonable.
Therefore, the court finds:
1) The jury continued to deliberate after it learned on Friday about the impending "Chip Smith" charge. It also deliberated the following Monday after the court gave the proper "Chip Smith" charge, and again on Tuesday, up to the verdict.
2) Any information carried into the jury room about a "Chip Smith" charge was not "extraneous evidence," but speculation about a soon to be given charge.
3) The court's charge the following Monday cured any incorrect notions that may have been previously disseminated. Juror Schmidt understood that charge with no difficulty and acted on it, not on the previous speculation.
4) The jury voted 11-1 for conviction before any discussion of the "Chip Smith" charge on Friday. It remained 11-1 for the balance of Friday and was again unchanged on Monday. It was not until Tuesday that Schmidt changed his vote, at which time the jury was unanimous for conviction.
5) The discussion about the "Chip Smith" charge on Friday did not cause Schmidt to change his mind, nor did it influence him or the other jurors. CT Page 4255-O
6) Not every irregularity in juror conduct compels reversal. The charged irregularity is not one of those which calls for reversal.
7) The court finds beyond a reasonable doubt that no harm or prejudice was done to the defendant's cause and that her constitutional rights were not adversely affected. The incident in question did not in any way compromise her right to a fair trial.
Since it is patently obvious that no prejudice occurred, the court finds no threshold reason, sufficient to require or justify further court interrogation of the other jurors. Schmidt was the only complaining juror and his testimony does not come close to establishing a finding of misconduct sufficient to disturb the verdict. "[T]he trial court should not hold such a proceeding if it is persuaded that a less extensive inquiry is more appropriate." State v. Brown, 235 Conn. 502, 530.
 IV
The court also believes that the interrogation by the private investigators conflicts with our rules of practice and our Supreme Court's rule set forth in Aillon v. State, 168 Conn. 541,550 (affirmed in State v. Avcollie, 188 Conn. 626, 643.) Inquiry into the mental processes of jurors in deliberation is forbidden even for the courts — much less for private investigators. The case once more points to the need for a court or legislatively mandated rule regulating post-verdict juror contact.
Every inquiry into juror deliberations is a potential incursion which may damage the basic foundation of the jury system — the secrecy of deliberations. That system should not be assaulted in the absence of clearly delineated good cause. This is the fifth time this court has faced alleged jury misconduct in just under two years. It appears to be the new defense of convicted defendants. The "'interest in insulating the jury's deliberative process' is a weighty one." Tanner v. U.S.,483 U.S. 109. "A Court must not allow jurors to be `harassed and beset by the defeated party in an effort to secure . . . evidence of facts which might establish misconduct.' McDonald v. Pless,238 U.S. 264, 267-8. `It is not at all clear . . . that the jury system could survive such efforts to perfect it.'" Neron v.Tierney, 841 F.2d 1197, 1204. (Emphasis added.) CT Page 4255-P
This court agrees with a number of federal and state courts in the belief that private investigators should not be allowed to make post-verdict juror inquiry in an effort to determine whether juror misconduct has occurred. If there is a good faith belief that misconduct existed, counsel should immediately notify the court and request an inquiry under the existing rule of State v.Brown, supra. Any inquiry which may be necessary should be carried out by the court or under its supervision.
The court here reaffirms its previous oral order that counsel shall not contact the jurors directly or through intermediaries. Any further inquiry must be under the aegis of the court. See,Miller v. U.S., 403 F.2d 77, 83 (2nd Cir.).
 V
The defendant also claims the state failed to disclose potentially exculpatory evidence. Counsel for the defendant informed the court that he received a letter from Thomas Marra, Jr., a convicted felon, stating that he and one James Kalman were involved in George Sabol's death. At a hearing, Marra testified that at meetings with then Chief Inspector John Solomon in 1985, 1986 and 1990 at Bridgeport, Solomon accused him of Sabol's murder and told him he'd see that he'd get the death penalty for it. Marra testified that he ignored the threat and never told Solomon during these interviews that he murdered Sabol or had anything to do with his death. Moreover, he stated he did not accuse anyone else of murdering Sabol. Attorney Frank Riccio, who also testified, confirmed that the state questioned Marra about a considerable number of unsolved murders, but that Marra never admitted to the Sabol crime or accused anyone else of committing it at these sessions. Inspector Solomon also testified and stated he did not recall accusing Marra of the Sabol murder at these meetings. He did state that during an earlier interview, probably before 1985, Marra told him that James Kalman (a former Marra associate) thought that Gus Curcio may have committed the murder and that Kalman and Mary Sabol (the deceased's daughter) broke into Curcio's house to look for a gun. However, Marra made no accusation of his own, nor did he admit culpability. It appears that all of these interviews were recorded by the state.
Apparently Marra, who is presently serving one hundred twenty years for kidnapping and murder convictions, was continually giving information to the police. Inspector Solomon testified CT Page 4255-Q that Marra was a liar and that he would only interview him on tape; that a great deal of the information he supplied evaded corroboration; that he admitted to a number of other murders which could not be confirmed, and some which were disconfirmed. Solomon stated he took a dim view of Marra's information and made it clear that Marra's credibility left a lot to be desired. Attorney Riccio stated that Marra was responsible for the creation of the homicide task force and said Marra gave hundreds of hours of testimony to this group.
The defense argues that since the inspector accused Marra of the Sabol murder, it must have had evidence against him which it suppressed. The state rejects that claim and argues that the defense failed to prove that any exculpatory evidence existed, let alone that it was suppressed.
The court has serious problems with Marra's credibility. Of the eighty nine convictions he admits, there are an ungodly number which directly affect the question of honesty. He has more larceny convictions than anyone this court has ever seen. He freely admitted tampering with evidence in 1985 as well as hindering prosecution and tampering with witnesses that year. After hearing Inspector Solomon's forthright testimony about the earlier break in, the court believes his version of the facts, including his failure to remember making any accusations, and his belief that he did not do so. But even if the court were to credit Marra's testimony, that would not help the defendant. Even taking that testimony at face value, there is nothing to indicate that someone other than the defendant committed this crime. The fact that the police might have made accusations does not prove that they had any evidence. They were dealing with a notorious criminal. Every attorney who seriously practiced criminal law knows that police interrogators often bluff those they think may have information, in the hope that if they shake the tree hard enough, something may fall out of it. The fact that no warrant was ever served on Marra regarding the Sabol killing corroborates the view that the police had no such evidence. Moreover, the death penalty, with which Marra claimed Solomon threatened him, was never applicable to the Sabol case, which Inspector Solomon surely knew. The better view is that the accusation was not made. But even if it was, it is of no consequence for the purposes of this case. There is simply no evidence produced by the defense that the police suppressed evidence that someone other than the defendant committed this murder. CT Page 4255-R
To prove a Brady violation, the defendant must show: 1) the prosecution suppressed evidence after a request by the defense; 2) the evidence was favorable to the defense; and 3) the evidence was material. State v. Rasmussen, 225 Conn. 55, 90 (1993). To violate the constitution, the transgression must deny the defendant a fair trial. State v. Daugaard, 231 Conn. 195, 205
(1994). "Favorable evidence is that evidence which might have led the jury to entertain a reasonable doubt about guilt and this doubt must be one that did not otherwise exist." State v. Jones,36 Conn. App. 417, 421-22 (1994). Suppressed evidence is material when it creates a reasonable doubt of guilt that did not otherwise exist. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense." State v. Daugaard,231 Conn. 205-06. Clearly, a Brady violation requires proof of evidence which would have changed the outcome had it been disclosed. State v. Pollitt, 205 Conn. 132, 142-43 (1987).
The evidence presented does not come close to establishing the three Brady prongs. It was not really favorable to the defendant since it conflicts with her own testimony. It in no way could have led the jury to entertain a reasonable doubt. It could not have changed the outcome. And since the court finds the defendant's proffered testimony lacks credibility, the Brady argument lacks substance.
 VI
As to Inspector Solomon's disclosure that Marra believed Kalman and Sabol's daughter in turn thought Curcio may have killed Sabol, the uncorroborated hearsay implication that Curcio killed Sabol is totally at odds with the defendant's own testimony that her daughter was the killer. Quite clearly, there were two people present with the deceased at the time of Sabol's murder: the defendant and her daughter. The jury believed the daughter's testimony that her mother committed the crime; they rejected the defendant's testimony that her daughter did it. There is no reasonable doubt that one of the two was the killer. The "suspicion" that Curcio might have done it is so blatantly in conflict with the obvious facts that it is not really exculpatory at all. There is nothing to connect this "suspicion" to the Sabol killing. The totality of the evidence requires the court to find that the introduction of this information would not have affected the outcome of Mrs. Tomasko's trial. The court finds that it CT Page 4255-S could not have even come close to overcoming the strength of the prosecution's case — based as it was on eyewitness testimony which the jury believed. It was not a weak, circumstantial case. Even the testimony that the jury rejected, from the defendant and a friend who allegedly walked into the Sabol house at the time of the murder, was consistent that there were only three people present: Sabol, the defendant and her daughter.
In another, even stronger case for the defendant, where a convicted felon twice confessed to a killing, the court held that the totality of the evidence required the conclusion that the confession would not have affected the outcome of the trial. "We do not believe nor can we hold that a vague confession of a convicted felon would have overcome the prosecution's case."Fulford v. Maggio, 692 F.2d 354, [692 F.2d 354], 357-58 (1982); reversed on other grounds, 462 U.S. 111. This case, of course, equally addresses the defendant's claims emanating from the 1985, 1986 and 1990 interviews. Even if Marra had said he committed the murder (which was not the case) that testimony would have been totally at odds with the obvious, uncontested facts and could not reasonably have changed the outcome of the trial.
The Kansas Supreme Court has held that statements by a man that he knew the real murderer were not exculpatory where they contradicted the defendant's testimony. State v. Ruebke,731 P.2d 842, [731 P.2d 842], 854-55 (Kan. 1987). And the New Jersey Supreme Court has held that if the putative exculpatory evidence does not sustain the defendant's version of the facts, there is no Brady violation. State v. DiFrisco,571 A.2d 914, [571 A.2d 914], 917 (N.J. 1990).
The court finds that the defendant has failed to demonstrate that the state suppressed exculpatory evidence with regard to the 1985, 1986 and 1990 conversations and with regard to the earlier conversation revealed by Inspector Solomon. Not only are the facts solidified as to who was present at the Sabol home at the time of the murder, but the court also notes a complete lack of any connecting testimony sufficient to even make third party culpability evidence admissible under prevailing law.
 VII
The defense also claims that since Suzette Meyer, the defendant's daughter. requested payment of the posted reward on March 24, 1995, it shows that her trial testimony, that she was CT Page 4255-T not seeking reward money for providing the state information leading to the defendant's conviction, was false and deprived the defendant of a fair trial.
Practice Book § 904 states that "[a] request for a new trial on the grounds of newly discovered evidence shall be called a petition for a new trial and shall be brought in accordance with Gen. Stat. § 52-270." "Newly discovered evidence which would be material to the issue at a new trial is any such evidence which . . . helps establish a meritorious defense which was not presented at the original trial." Reilly v. State,32 Conn. Sup. 349, 355 (Sup.Ct. 1976). It is evidence that "could not have been discovered earlier by the exercise of due diligence." Asherman v. State, 202 Conn. 429, 434 (1987). The petition for a new trial based on newly discovered evidence is a civil action representing a separate and distinct proceeding.
The fact that Suzette Meyer collected the reward after the trial is newly discovered evidence which was not available at the time of trial since it had not yet occurred. Accordingly, the defendant must bring a petition which is a civil action seeking a new trial based on this evidence. The court declines to act on this allegation.
If evidence is presented that Marra made statements implicating himself and another in the killing after the verdict, that too would be the subject of a civil petition for a new trial, although the court fails to see how that information, if forthcoming, can possibly overcome the impediments enumerated in Parts V and VI above.
Accordingly, the defendant's motion is denied in its entirety.
Samuel S. Freedman, Judge